2009 UT App 137

**STEVENSEN 3RD EAST, LC, a Utah limited liability company, Plaintiff and Appellee,**

v.

**Russell K. WATTS, an individual; R.K.W. 96, LC, a Utah limited liability company; The Club Condominium, LC, a Utah limited liability company; and John Does 1–100, Defendants and Appellant.**

No. 20070765–CA.

Court of Appeals of Utah.

May 21, 2009.

Dennis K. Poole and Elizabeth P. Miller Evans, Salt Lake City, for Appellant.

Thor B. Roundy, Midvale, for Appellee.

Before Judges GREENWOOD, BENCH, and McHUGH.

## OPINION

BENCH, Judge:

¶1 Defendant Russell K. Watts appeals from a jury verdict finding that he breached his fiduciary duties as a manager of a real estate development limited liability company and caused damage to Plaintiff Stevensen 3rd East, LC (3rd East) in the amount of $474,000. On appeal, Watts claims that the trial court erred in instructing the jury as to the standard of care for a limited liability company manager and the measure of damages for a breach of fiduciary duty. Watts also challenges the trial court's ruling regarding the admissibility of certain expert testimony, the sufficiency of the evidence in support of the verdict, and the award of prejudgment interest, attorney fees, and costs. We affirm in part, and we reverse and remand in part.

## BACKGROUND

¶2 In 1995, Ted Stevensen and Watts decided to develop real estate owned by Stevensen. To effectuate their plans, the parties formed The Club Condominium, LC (The Club) by signing an operating agreement (the Operating Agreement). The Club was to be owned equally by its two members: (1) R.K.W. 96, LC (RKW 96), managed by Watts, and (2) 3rd East, managed by Stevensen. Watts and Stevensen ultimately decided to build a residential condominium project, for which 3rd East contributed land valued at $631,000 and RKW 96 contributed $180,000 in cash and a development fee booked at $451,000. The "sole purpose" of The Club was "the acquisition, development, ownership, management, sale and/or leasing of [the real property contributed by 3rd East], and other related business."

¶3 The Operating Agreement named Watts as manager of The Club. It authorized Watts Corporation (Watts Corp), an affiliate of Watts, to act as the general contractor for The Club, and it also authorized Kevin Watts Architects (the Architect), Watts's father's architectural firm, to act as the project's architect. The Operating Agreement stated that Watts Corp and the Architect "shall be

paid [their] normal and customary fees charged on an arms-length basis to third parties for similar services." The Operating Agreement further provided, "Neither the scope and nature of the Project nor such budget shall be subject to change unless such change is agreed to in writing by the holders of a majority of the Interest ... and both [RKW 96] and [3rd East]."

¶ 4 In order to obtain financing for this project, The Club had an appraisal prepared. The appraisal included figures on absorption rates—the time it takes for buyers in a particular market to purchase units offered for sale. It warned that the absorption of higher priced condominium units may be problematic, noting that higher priced units would likely sell more slowly in 1998 than in 1997. Watts was aware of the appraisal and its cautions about the market for higher priced units.

¶ 5 The Club subsequently obtained a bank construction loan in an amount smaller than needed to complete the project. Watts, as manager, intentionally procured a smaller loan with the plan to use proceeds of early sales to complete remaining units and, if needed, to borrow additional funds from private lenders. The maturity date for the bank loan was March 1999.

¶ 6 The Architect finalized the plans in June 1997, and construction began two months later. The contract between Watts Corp and The Club required completion by November 1998. Watts Corp had originally indicated that it could have the project completed by July 1998.

¶ 7 Ultimately, The Club held its grand opening in February 1999, although it did not receive its certificate of occupancy until July 1999. Once the grand opening had occurred, Stevensen and Watts split floor time between themselves to market and show the units to prospective buyers. By March 1999, Watts suggested that Stevensen should no longer participate in showing the units because Stevensen had not made any sales. In response, the parties signed an agreement (the March 1999 Agreement) under which Watts Group, a marketing group also affiliated with Watts, would take over marketing and selling the units. Under the March 1999 Agreement, Watts Group would receive a 3% commission on the sales it made and 3rd East would receive a 1% fee of the sales price of every unit sold to buyers through the Watts Group. The March 1999 Agreement also established a priority of debt repayments and reduced the interest on outstanding payments to Watts Corp from 12% to 9%.

¶ 8 Between 1996 and 1998, Watts produced several budgets representing the costs associated with the project's construction, taxes, marketing, and maintenance, as well as the projected profit for The Club's members. 3rd East received copies of these budgets in January 1997, October 1997, and October 1998. Although the costs associated with building the project continued to increase, the projected profit in each of these budgets remained at approximately $800,000.

¶ 9 By September 1999, half of the condominium units remained unsold. At that point, Watts provided 3rd East with yet another budget estimate, which for the first time showed a significant decrease in projected profits. The September 1999 budget indicated that the projected net profit on the project would be $50,000, with a possible net loss of $50,000. 3rd East and Watts had a disagreement as to how to proceed in light of the drastically reduced profit projections. 3rd East claimed that Watts kicked out its principal, Stevensen, and prohibited him from working on behalf of The Club. Watts claims that Stevensen left voluntarily. Nevertheless, after their disagreement, 3rd East was not involved in The Club's decisions and Watts ceased to make profit advances to 3rd East or to pay 3rd East's 1% fee on unit sales. The Club did not sell its final unit until November 2002.

¶ 10 In 2001, 3rd East, along with Stevensen and his wife in their individual capacities, brought suit. They asserted the following claims against Watts and other defendants, including The Club: (1) declaratory relief, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) unjust enrichment. 3rd East and the Stevensens also brought claims against Watts for breach of fiduciary duty, fraud, and negligent misrepresentation, as well as

claims against The Club's attorney for breach of fiduciary duty and negligence.

¶ 11 The claims against The Club's attorney settled prior to trial, and the Stevensens' individual claims were dropped. Also prior to trial, 3rd East succeeded in receiving a requested declaration that it was entitled to a 1% commission on all units sold by Watts Group. After failed attempts to settle, 3rd East proceeded to trial against Watts on the claims of negligent misrepresentation and breach of fiduciary duty, but only the claim of breach of fiduciary duty went to the jury. 3rd East also proceeded to trial against The Club on the claim of breach of the covenant of good faith and fair dealing.

¶ 12 At trial, the jury heard testimony that Watts had worked in real estate development since 1976 and had participated in over a hundred projects. Prior to working with Watts on The Club, Stevensen had no experience in real estate development. He relied on and trusted Watts's judgment and expertise.

¶ 13 The jury also heard testimony from 3rd East's construction expert regarding Watts's performance as manager of The Club. The construction expert opined that Watts had not taken care to ensure that The Club would turn a profit on the project because Watts did not adhere to a fixed plan or a fixed budget. The construction expert stated that Watts was constantly changing the design plans for the project to make a higher priced product. He opined that those changes caused a delay in the project's completion which, in turn, caused the cost of the project to increase through both hard costs and interest payments. The construction expert stated that Watts began to change the design almost as soon as construction began.

¶ 14 The construction expert also testified that Watts failed to properly implement or administer the contracts with Watts Corp and the Architect. Although the parties agreed to use affiliated entities to perform work for The Club, Watts did not enforce contractual provisions with those entities to the benefit of The Club nor did he use them in a manner typical in the industry. In particular, the construction expert took issue with the use of a cost-plus-percentage-fee payment arrangement with Watts Corp because it created a conflict of interest. Because Watts Corp was paid a percentage of the costs of construction, Watts Corp's profits increased as the cost of construction increased. Although Watts, as manager of The Club, had the ability to tell the contractor to finish work within a certain time frame and budget to ensure that The Club still turned a profit, he did not do so. Furthermore, contrary to industry customs, Watts used the Architect only to ensure that the project was built to codes and plans instead of to ensure that the contractor stayed within budget.

¶ 15 Although the construction expert stated that Watts was not "throwing money away," he did not see any evidence that Watts had made an investigation to ensure that The Club's profit would increase proportionately to the cost increases. Because of a lack of set plans and set bids, the construction expert believed that Watts likely lacked sufficient information to even know how far over budget he was as he directed the redesigns. The construction expert ultimately opined that The Club's original budget and plans seemed reasonable and that the construction could have been completed on schedule had Watts adhered to the original designs. However, the construction expert could not identify specific unnecessary changes that Watts had made to the project, nor could he opine as to the availability of buyers in the market at the relevant time periods.

¶ 16 3rd East's banking expert testified as to the risks associated with increasing the cost of construction without a corresponding increase in value. He indicated that The Club's loan with the bank had become out of balance with the cost of the project. He also affirmed the initial appraisal's predictions about a slowing market in 1998 for higher priced condominiums.

¶ 17 Watts testified that he and the marketing team were constantly assessing the market condition so he could create a product that fit those conditions. He stated that the intent of redesigning or changing the project was to create more value for a pro-

spective buyer and that he was compelled to make a higher quality product in order to make sales. However, Watts admitted that many of the changes were made before any prospective buyers told him that purchase was conditioned upon upgrades to the unit. Watts also identified other causes of delay and increased costs besides the design changes, such as weather, interest, marketing costs, utility costs, and finish improvements dictated by buyers. He stated that the interest, marketing costs, and utility costs were due to a slow, difficult sales period.

¶ 18 Watts also explained that his decision to borrow less than needed from the bank to complete the project was due to a desire to save The Club money in interest payments. After the bank loan ran out, Watts borrowed additional money from private lenders because he determined that The Club could save money due to the fact that private lenders do not charge as much. Watts stated that he quit paying 3rd East's principal, Stevensen, the $5000 monthly advances and the 1% commission on sales because he knew there likely was not going to be a profit. He also knew that he had an obligation to pay creditors of The Club before he paid the members, in part because of the priority of debt repayments established by the March 1999 Agreement.

¶ 19 Watts understood that the cost-plus-percentage-fee payment arrangement provided for in the contract between The Club and Watts Corp would result in increased payments to Watts Corp in the event that construction costs went up. He also understood that increasing construction costs after October 1998, at a time when The Club was unable to pay Watts Corp, would lead to interest charges from Watts Corp. Although Watts discussed with Stevensen the upside of the Watts Corp contract, he admitted that he never discussed the downside. Watts also did not provide updated projected cost and profits between the time he knew that The Club had run out of money, October 1998, and the time he informed Stevensen that there may be a loss on the project, September 1999. Watts testified that he fully informed 3rd East with respect to the risks he

was taking with regard to design changes and increased costs. However, Stevensen testified that he was taken by surprise when he received the September 1999 budget, which estimated minimal, if any, profit.

¶ 20 When the project ran out of money around October 1998, The Club received four extensions on the bank loan and borrowed money from Watts Corp, RKW 96, another Watts affiliated entity, and other private investors. The evidence at trial showed that the ultimate cost of completing the project was over $2.75 million beyond the amount originally budgeted for construction costs, over $750,000 more than had been budgeted for interest payments, and over $300,000 more than had been budgeted for advertising and marketing expenses. The Club ultimately sustained a net loss while Watts Corp received significantly more money than originally planned.

¶ 21 With respect to damages, the evidence showed that while 3rd East had received $162,000 in draws on profits, it did not receive its original capital back after the project was completed, and thus, it sustained a loss of $469,000. 3rd East's economic expert opined that 3rd East was entitled to damages ranging from $262,109 to $1,346,209. Watts's expert opined that 3rd East had actually been overpaid.

¶ 22 The jury found that Watts had breached his fiduciary duties as manager of The Club by committing gross negligence or willful misconduct. The jury also found that the breach of fiduciary duty caused damages to 3rd East in the amount of $474,000. Although the jury did not find that The Club had breached the section of the Operating Agreement that required 3rd East's written agreement for any changes to the scope, nature, and budget of the project, it did find that The Club had breached its duty of good faith and fair dealing. The jury concluded that The Club's breach of this duty caused damage to 3rd East in the amount of $26,240.

¶ 23 As the prevailing party at trial, 3rd East received an award for attorney fees, prejudgment interest, taxable costs, and litigation expenses, which included expert witness fees and photocopying costs. The trial court based the amount of attorney fees

awarded on an affidavit submitted by 3rd East's counsel. The trial court determined that 3rd East was entitled to prejudgment interest because the damages were complete and measurable by fixed rules of evidence pursuant to *Fell v. Union Pacific Railway Co.*, 32 Utah 101, 88 P. 1003 (1907). The trial court ruled that 3rd East was also entitled to taxable costs and that 3rd East's litigation expenses, namely, the expert witness fees and photocopying costs, were recoverable as consequential damages. This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

¶ 24 Watts claims that the trial court erred by instructing the jury that he should be held to the standard of a professional builder and real estate developer instead of the standard of an ordinarily prudent person. Watts also claims that the trial court erred in allowing the jury to "use any formula or theory for determining damages" rather than instructing the jury to determine lost net profits. "We review [a] challenge to . . . jury instructions for correctness, granting the trial court no deference on its view of the law." *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 466 (Utah 1996).

¶ 25 Watts next claims that the trial court abused its discretion in admitting testimony from 3rd East's banking and construction experts, arguing that the testimony lacked relevance or was more prejudicial than probative. "The trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard. Under this standard, we will not reverse [a decision to admit or exclude expert testimony] unless the decision exceeds the limits of reasonability." *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794 (alteration in original) (internal quotation marks omitted).

¶ 26 Watts also challenges the sufficiency of the evidence in support of the jury verdict, specifically, the findings of causation and damage. "In reviewing a jury verdict, we view the evidence in the light most supportive of the verdict[ ] and assume that the jury believed those aspects of the evidence which sustain its findings and judgment." *Billings*, 918 P.2d at 467 (internal quotation marks omitted). As a result, "we will upset a jury verdict only upon a showing that the evidence so clearly preponderates in favor of the appellant that reasonable people would not differ on the outcome of the case." *Id.* (internal quotation marks omitted).

¶ 27 Finally, Watts challenges the trial court's award to 3rd East of prejudgment interest, attorney fees in the amount of $226,400, taxable costs, and litigation expenses. "A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness." *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 1, 82 P.3d 1064 (internal quotation marks omitted). "The standard of review on appeal of [the amount of] a trial court's award of attorney fees is patent error or clear abuse of discretion." *Pack v. Case*, 2001 UT App 232, ¶ 16, 30 P.3d 436 (alteration in original) (internal quotation marks omitted). "[A] trial court's decision to award the prevailing party its costs will be reviewed under an abuse of discretion standard." *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶ 41, 70 P.3d 35 (alteration in original) (internal quotation marks omitted).

## ANALYSIS

### I.   Jury Instructions

¶ 28 Watts claims that the trial court erred in instructing the jury with respect to a limited liability company manager's standard of care and the appropriate measure of damages for a breach of fiduciary duty. "To prevail on an appeal based on instructions to the jury, this court must find both that the instruction was inaccurate and that there is not a mere possibility, but a reasonable likelihood that the error affected the result." *Haupt v. Heaps*, 2005 UT App 436, ¶ 38, 131 P.3d 252 (internal quotation marks omitted). If it appears "highly probable that the jury considered . . . [the correct] factors during its deliberations even though not specifically instructed to do so," a court's error in instructing the jury will not be considered to have affected the verdict. *C.T. ex rel. Taylor v. Johnson*, 1999 UT 35, ¶ 18, 977 P.2d 479.

## A.  Manager's Standard of Care

¶ 29 Watts asserts that the trial court imposed an incorrect heightened standard of care when it instructed the jury that Watts should be held to the standard of care of a manager who was also a builder and developer of real estate.  Utah Code section 16–10a–840 states that a director of a corporation "shall discharge his duties . . . with the care an ordinarily prudent person in *a like position* would exercise *under similar circumstances.*"  Utah Code Ann. § 16–10a–840(1)(b) (2005) (emphases added).  It also states that "[a] director . . . is not liable to the corporation . . . for any action taken . . . unless . . . the director['s breach of his or her duties] . . . constitutes gross negligence, willful misconduct, or intentional infliction of harm on the corporation."  *Id.* § 16–10a–840(4)(a)–(b).

¶ 30 In this case, the jury was instructed, The standard of care which a defendant manager, who is also a builder and a real estate developer, must exercise is that amount of skill and learning ordinarily possessed and exercised by other members of the defendant's profession practicing in the same or similar community and under similar circumstances.  In applying that skill and learning, the Defendant has a duty not to act in a manner which would constitute gross negligence or willful misconduct by a builder and real estate developer practicing his profession in this community.

The instruction also stated, "As a builder and real estate developer, Russell Watts is not held to a standard of perfection, nor to a degree of skill and learning of an extraordinarily skillful or learned real estate developer or an extraordinarily cautious one."  The instruction clarified, "While exceptional skill, learning, and caution are admired and encouraged, the law does not demand them as a general standard of conduct."  The instruction concluded, "Russell Watts may make an error of judgment or a mistake in the performance of services, or disagree with other members of the builder and real estate development community without being grossly negligent or engaging in willful misconduct."  This instruction appears to be partially modeled on the Model Utah Jury Instruction for the standard of care of design professionals, *see* Model Utah Jury Instruction 7.30 (Utah State Bar 1993).

¶ 31 We conclude that the instruction did not erroneously advise the jury as to the standard of care for Watts.  The standard of care for a corporate director specifically allows the jury to compare the director to others "in a like position" who are in "similar circumstances."  *See* Utah Code Ann. § 16–10a–840(1)(b).  The limited liability company for which Watts acted as a manager was created for the sole purpose of developing a particular piece of real estate by building condominiums.  The court did not err in instructing the jury to compare Watts's performance as a manager of The Club with that of other managers engaged in the business of building and developing real estate.

## B.  Damages

¶ 32 Watts claims that the trial court erred when it failed to instruct the jury to use a lost net profit measure to calculate damages on 3rd East's breach of fiduciary duty claim.  "In Utah, a claim for breach of fiduciary duty is an independent tort that, on occasion, arises from a contractual duty."  *Norman v. Arnold,* 2002 UT 81, ¶ 35, 57 P.3d 997.  Like the fiduciary duties of general partners or corporate officers, a limited liability company manager's fiduciary duty arises from the corporate relationship itself, independent of any contractual duties.  *See d'Elia v. Rice Dev., Inc.,* 2006 UT App 416, ¶ 36, 147 P.3d 515 (holding that a general partner's fiduciary duties arose "independent of any contractual duties" (citing Utah Code Ann. § 48–1–18 (2002) (describing the fiduciary relationship inhering in a partnership))); *see also Jones Mining Co. v. Cardiff Mining & Milling Co.,* 56 Utah 449, 191 P. 426, 438 (1920) (describing corporate officers as "managing agents of the corporation, [who], as such, sustain a fiduciary relation both to it and to the stockholders collectively").  *See generally* Utah Code Ann. § 48–2c–802(2)(a) (2007) (describing a limited liability company manager as "an agent of the company"); *id.* § 48–2c–807(3) (distinguishing limited liability company members who are managers from members who are not

and stating that ordinary members do not have fiduciary duties). As a result, "a breach of those fiduciary duties sounds in tort." *See d'Elia*, 2006 UT App 416, ¶ 36, 147 P.3d 515.

¶ 33 Although the remedy of a beneficiary against a breaching fiduciary can be in equity, "the beneficiary is entitled to tort damages for harm caused by the breach of [the fiduciary's] duty." Restatement (Second) of Torts § 874 cmt. b (1979). "In addition to or in substitution for these damages the beneficiary may be entitled to restitutionary recovery...." *Id.* This restitutionary measure of recovery is allowed because the beneficiary is "not only ... entitled to recover for ... harm done to his legally protected interests by the wrongful conduct of the fiduciary, but ordinarily he is entitled to profits that result to the fiduciary from his breach of duty and to be the beneficiary of a constructive trust in the profits." *Id.*

¶ 34 Other measures of damages can apply to a breach of fiduciary duty action depending on the particular fiduciary relationship involved. The Restatement of Torts notes that "[s]ome fiduciary relations ... are the subject of a considerable group of substantive rules of law" and are thus "controlled by the substantive law rules governing the relationship." *Id.* § 874 reporters notes. These types of fiduciary relations can include "trustee and beneficiary, principal and agent[,] and director and corporation." *Id.* Nevertheless, "the action [for breach of fiduciary duty] may properly be regarded as in tort for damages." *Id.*

¶ 35 Utah courts have applied the approach described by the Restatement of Torts, varying the exact measure of damages in a breach of fiduciary duty case based on the type of fiduciary relationship involved and the extent to which other areas of substantive law apply to that relationship. For example, the Utah Supreme Court determined that damages for the breach of a real estate agent's fiduciary duty to its principal—the seller of real property—is properly measured by the amount the agent negligently failed to collect in earnest money. *See Hopkins v. Wardley Corp.*, 611 P.2d 1204, 1206–07 (Utah 1980). Where an insurer breached its fiduciary duty to defend its insured, the insurer was "expose[d] ... to consequential and punitive damages awards in excess of policy limits." *Black v. Allstate Ins. Co.*, 2004 UT 66, ¶ 25, 100 P.3d 1163 (internal quotation marks omitted). Additionally, where a common shareholder in a corporation can prove that a merger was a result of a breach of fiduciary duty, the supreme court held that "the appropriate measure of damages is the value of the [shareholder]'s shares had the company not merged." *Borghetti v. System & Computer Tech.*, 2008 UT 77, ¶ 30, 199 P.3d 907.

¶ 36 Here, the jury instruction regarding damages was patterned after Model Utah Jury Instruction 19.16, which pertains to the measure of damages for a business tort. Like the model instruction, the instruction in this case explained that the damages must be a proximate result of the defendant's wrongful acts, that difficulty in ascertaining a precise amount of damages is not fatal to recovery, that the amount of damages need not be proven with mathematical precision, that the amount of damages may be determined by estimation or approximation, and that the evidence supporting damages must rise above mere speculation. *See* Model Utah Jury Instruction 19.16 (Utah State Bar 1993). However, the jury instruction omitted the language from the model instruction that directed the jury to consider and restrict the damage award to a plaintiff's "loss of profits" or "other losses caused by" the defendant's tort. *See id.*

■ ¶ 37 The trial court correctly identified the measure of damages appropriate for this case as being akin to the measure of damages for a business tort. We have previously recognized that "a corporate mismanagement claim may be subject to a tort standard of liability." *Reedeker v. Salisbury*, 952 P.2d 577, 587 (Utah Ct.App.1998). And other areas of substantive law do not exclusively control the measure of damages relevant to this particular fiduciary relationship. Furthermore, a more general tort measure of damages does not apply as directly to 3rd East's breach of fiduciary duty given that 3rd East's claim centered on a limited liability company's failure to turn a profit, rather

than on negligence that caused damages such as pain and suffering or emotional distress.

¶ 38 The trial court erred, however, in failing to instruct the jury to measure the damages by the pecuniary loss experienced by 3rd East, as measured by lost net profits or any other consequential losses for which the breach of fiduciary duty was the cause. *See Sampson v. Richins*, 770 P.2d 998, 1006–07 (Utah Ct.App.1989) (outlining the measure of damages for a business tort (citing Restatement (Second) of Torts § 774A (1979))). Omitting this part of the instruction could allow the language "any formula or theory for determining damages" to be taken too broadly.[1] Nevertheless, we conclude that it was not reasonably likely that this error affected the result here.

¶ 39 Here it seems "highly probable that the jury considered ... [the correct] factors during its deliberations even though not specifically instructed to do so." *See C.T. ex rel. Taylor v. Johnson*, 1999 UT 35, ¶ 18, 977 P.2d 479. Although the phrase "lost net profits" did not appear to be explicitly used, the entire thrust of 3rd East's case was that The Club had a multi-million dollar budget—which included expenditures and costs—and Watts, as manager, unjustifiably ran up the costs and ate into profits. The evidence presented to the jury included various budgets for the project where the cost of building was in the millions of dollars and the ultimate profit was to be around $800,000. 3rd East's construction expert emphasized the importance of designing a project within a budget and building what was designed so that the cost does not exceed the value of the project and eliminate the remaining profit.

¶ 40 In closing arguments, 3rd East's attorney told the jury that there were four possible ways to calculate damages: (1) comparing the costs listed in the budget Watts submitted to the bank with the sale price given in the professional appraisal; (2) looking at the actual sale price and subtracting

the amount of costs that 3rd East and Watts agreed to in their original budget; (3) looking at the actual sale price and subtracting the expenses that were unjustified and did not add value to the project; or (4) examining Watts's expert's report and subtracting the amount of a development fee that was reportedly improperly paid twice to Watts. Each of these suggested calculations involve an examination of costs or expenses in relation to the overall gross revenues and a determination of what the net profits should have been. Furthermore, in his closing argument, Watts's counsel told the jury—without objection—that "[t]he law would require the damages to be computed on what is called net profits." He continued,

> [T]he plaintiff doesn't get damages based on this figure, which is gross, because there's cost incurred. All of these costs had to be expended to get a profit figure or a loss, and it is their burden to show gross sales in this case, the cost of doing business and then a resulting net profit.

¶ 41 The verdict that the jury returned against Watts included a damage figure that was $474,000. This figure was well within the range of net profits projected by 3rd East's experts, hovering closer to the lower end of the range. It is nowhere close to any of the multi-million dollar figures that constituted The Club's estimated or actual gross revenue. Accordingly, we conclude that there was no reasonable likelihood that the jury was misled as to the appropriate measure of damages for Watts's breach of fiduciary duty and that any error in the jury instruction was harmless.

## II. Admissibility of Expert Testimony

¶ 42 Watts claims that the trial court abused its discretion in admitting two pieces of testimony: (1) 3rd East's banking expert's testimony that Watts did not comply with banking industry standards for reporting design changes and for maintaining an appropriate balance between the loan amount and

---

1. The proper measure of damages resulting from a business tort is lost profits, as opposed to lost gross receipts. Thus, an objection to an instruction that asks the jury whether it finds that the plaintiff has sustained a "loss of business" should be sustained, because the term "loss of business" is not synonymous with lost profits, and such wording might easily mislead the jury into finding that the plaintiffs are entitled to lost gross revenues.
22 Am.Jur.2d *Damages* § 456 (2003).

the actual construction costs, and (2) 3rd East's construction expert's testimony regarding construction industry standards, in particular, arms-length contracts with third parties. Watts asserts that this testimony was unreliable and irrelevant, and that even if it was relevant, it was prejudicial and misleading.

## A. Banking Expert

¶ 43 Watts first argues that the banking expert's testimony was unreliable because the banking expert did not review any internal bank documents, thereby preventing the banking expert from knowing what the bank knew or when the bank knew it. While the banking expert admitted that he did not review any internal bank records, he did base his testimony on Watts's own testimony regarding his interactions with the bank and the assigned loan officer. Furthermore, the banking expert reviewed the appraisal prepared prior to the commencement of construction, various multiple listing statistics for the relevant time period, the report prepared by Watts's real estate broker, and other loan documents—including the construction loan documents. The banking expert's testimony was therefore sufficiently reliable.

¶ 44 Watts further asserts, however, that the trial court abused its discretion in admitting the banking expert's testimony because the testimony was irrelevant given that the later testimony did not show that 3rd East had relied on the lending standards of the banking industry. Even if 3rd East did not overtly rely on these standards, this testimony is relevant to the potential breach of fiduciary duties of care, loyalty, honesty, and good faith owed to 3rd East. The banking expert began his testimony by explaining that the lending standards are designed to protect against the risk that a construction project will cost more than it is worth at the time of completion. Although this poses a risk to the bank that the bank will not be repaid, it also illustrates the risk that the owner of a development project will not turn a profit. Watts's actions with respect to procuring the loan and changing design plans that increased the cost of the project are

relevant to the care he took to protect The Club's interests.

## B. Construction Expert

¶ 45 3rd East's construction expert testified that the payment scheme in the construction contract with Watts Corp was not the type of payment scheme ordinarily found in arms-length contracts between owners and builders. The construction expert also testified that the liability limits in the Architect's contract were lower than would typically be found in an arms-length contract. Although the construction expert acknowledged that parties could agree to operate in contradiction to industry standards so long as the agreement did not violate the law, the construction expert repeatedly asserted that Watts's *implementation* of the agreements with Watts Corp and the Architect did not protect the owner, The Club. In particular, the construction expert indicated that Watts Corp benefitted to The Club's detriment when Watts Corp charged The Club interest.

¶ 46 Watts claims that this testimony was irrelevant because 3rd East's claims were not based on the contract, no claims had been made against the Architect, and the Operating Agreement explicitly permitted Watts to use affiliated entities as contractor and architect. The trial court ruled that the construction expert's industry standard testimony was admissible, specifically noting that defense counsel could cross-examine the construction expert on the issue of contracting around industry standards.

¶ 47 The trial court did not abuse its discretion by admitting the construction expert's testimony. Although 3rd East was not pursuing a breach of contract claim, it was pursuing a breach of fiduciary duty claim that, as mentioned above, put into question Watts's care, good faith, loyalty, and honesty as a limited liability company manager. Thus, Watts's administration and implementation of contracts with the contractor and the Architect were relevant to that standard of care. The contrast between industry standards and the actual relationships between The Club, Watts Corp, and the Architect simply showed how Watts's loyalty as a manager could have been divided, how Watts

may have been able to be less forthright about the costs associated with the design changes, and how Watts may have been less motivated to be careful about protecting The Club's interests.

¶ 48 While the testimony of these experts may not have been favorable to Watts, the testimony was not unduly prejudicial.

Evidence is unfairly prejudicial if it has a tendency to influence the outcome of the trial by improper means, or if it appeals to the jury's sympathies, or arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions of the case.

*Olympus Hills Shopping Ctr. v. Smith's Food & Drug Ctrs.*, 889 P.2d 445, 455 (Utah Ct.App.1994) (internal quotation marks omitted). It has not been shown how testimony about reporting to a bank, maintaining a balanced loan, or using neutral third parties as a standard construction industry practice would play on the jury's sympathies, let alone horrify them. It is clear, however, that the jury was not provoked to punish Watts due to this testimony because the jury declined to award punitive damages and kept its compensatory damages award well below the maximum amount 3rd East's evidence purported to allow. We therefore conclude that the trial court's admission of the expert's contested testimony was not beyond the bounds of reasonability.

### III. Sufficiency of the Evidence

¶ 49 Watts asserts that the verdict should be overturned due to a lack of substantial evidence to support the jury's finding of gross negligence or willful misconduct, or its finding of causation. "The burden on an appellant to establish that the evidence does not support the jury's verdict and the factual findings implicit in that verdict under such a circumstance is quite heavy." *Cambelt Int'l Corp. v. Dalton,* 745 P.2d 1239, 1242 (Utah 1987). The existence of conflicting evidence, alone, does not justify overturning a verdict for insufficient evidence because "we assume that the jury believed those facts that support its verdict."

*Canyon Country Store v. Bracey,* 781 P.2d 414, 417 (Utah 1989) (internal quotation marks omitted). In fact,

[t]he question on appeal from a judgment based on a jury verdict is not whether there is substantial evidence which would have supported a contrary verdict, or even whether [the appellate court], had it been trier of fact, would have reached the same verdict as that reached by the jury.

*Id.* at 418. Instead, "the issue is whether the jury's findings are supported by substantial competent evidence." *Id.* "Having considered the evidence in accordance with this standard," we conclude that "the evidence [at trial did not] so clearly preponderate[ ] in favor of [Watts] that reasonable people would not differ on the outcome of the case." *See Billings v. Union Bankers Ins. Co.,* 918 P.2d 461, 467 (Utah 1996).

¶ 50 Evidence was presented to support the jury's finding of a breach of fiduciary duty, including a breach of the duty of care that amounted to gross negligence or willful misconduct. 3rd East presented testimony through its banking expert that making changes to a project's design after construction commenced risked either delay of the completion of construction or depletion of the funds needed to complete construction. The evidence showed that Watts knew of these risks, but he intentionally borrowed less than was needed to complete construction as originally designed. The evidence also showed that Watts had been warned by an independent appraiser that the market for higher priced condominiums would be slowing by 1998, which created a risk that it would be more difficult to sell such units. Nonetheless, Watts took the risk and chose to change the design to make more higher priced units than had been originally planned. And Watts continued to make those design changes after the project had run out of funds and after the original projected date of completion had passed. Expert testimony indicated that Watts himself lacked sufficient information to know how far over budget he had gone. Indeed, Watts conceded that the projected profit did not increase even as the costs went up. 3rd East's construction and banking experts tes-

tified that an increase in costs without corresponding increase in profit also meant an increasing risk that a profit would not be made.

¶ 51 The evidence also showed that while Watts may have procured 3rd East's consent for some of his actions, this consent was not an informed consent. Watts did not fully explain to 3rd East the risks that he was causing The Club to take or the benefits that his affiliated entities, such as Watts Corp or Watts Group, were to receive.[2] Watts himself admitted that he tended to discuss the upside potential of his decisions, such as paying Watts Corp a percentage of the cost of construction, rather than the downside. Watts also admitted that 3rd East's principal, Stevensen, would not have been able to independently determine whether the project was on budget.

¶ 52 There was also evidence in support of the jury's finding that Watts caused the damage experienced by 3rd East. Regardless of what the exact design changes were, Watts admitted that the reason for the delay in completion and the increased costs was his design changes. Expert testimony indicated that Watts's perpetual "tweaking" of the designs virtually guaranteed a loss on the project.

¶ 53 Finally, the amount of damages awarded by the jury did not amount to pure speculation. "The reasonable level of certainty required to establish the amount of a loss is generally lower than that required to establish the fact or cause of a loss." *Kilpatrick v. Wiley, Rein & Fielding*, 2001 UT 107, ¶ 76, 37 P.3d 1130 (internal quotation marks omitted). As a result, "the certainty requirement is met as to the amount of [damage] if there is sufficient evidence to enable the trier of fact to make a reasonable approximation." *Id.* (internal quotation marks omitted). Furthermore, "the approximations [may be] based upon reasonable assumptions or projections." *Sampson v. Richins*, 770 P.2d 998, 1007 (Utah Ct.App.1989) (internal

quotation marks omitted). Here, the amount of damage was based on an approximation that fell within the range of loss presented by expert testimony.

¶ 54 On appeal, Watts has highlighted testimony he presented at trial that either conflicted with or attacked the credibility of evidence presented by 3rd East. Given the deference accorded a jury's verdict, we assume that the jury either did not believe the conflicting evidence or did not find the credibility of 3rd East's evidence so lacking as to prevent a finding in 3rd East's favor. Thus, Watts has failed to show that the evidence so clearly preponderated in his favor that no reasonable person could have found in favor of 3rd East, and we therefore affirm the jury verdict.

## IV. Award of Prejudgment Interest, Attorney Fees, and Costs

### A. Prejudgment Interest

¶ 55 Watts claims that the trial court erred by awarding 3rd East prejudgment interest because the damages were determined by the best judgment of the jury rather than ascertained to a mathematical certainty. "As established nearly a century ago ..., Utah courts award prejudgment interest in cases where 'damages are complete' and can be measured by 'fixed rules of evidence and known standards of value.'" *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 17, 82 P.3d 1064 (quoting *Fell v. Union Pac. Ry. Co.*, 32 Utah 101, 88 P. 1003, 1007 (1907)). Thus, "[p]rejudgment interest is appropriate when the loss ha[s] been fixed as of a definite time and the amount of the loss can be calculated with mathematical accuracy in accordance with well-established rules of damages." *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 51, 622 Utah Adv. Rep. 23, 210 P.3d 263 (second alteration in original) (internal quotation marks omitted). However, prejudgment interest is not appropriate when the jury is simply "'guided by their best judgment in assessing the

2. Contrary to Watts's assertion, the fact that the jury found no breach of the Operating Agreement's provision that required Watts to procure 3rd East's written approval for changes does not preclude the jury from finding in favor of 3rd East. 3rd East's claim against Watts was for breach of fiduciary duty, which fiduciary relationship imposed on Watts duties independent of those imposed by contract.

amount allowed for past as well as for future injury.'" *Price–Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.,* 784 P.2d 475, 483 (Utah Ct.App.1989) (quoting *Fell,* 88 P. at 1007).

¶ 56 Watts points to *Cornia v. Wilcox,* 898 P.2d 1379 (Utah 1995), to support his contention that the amount of damages in this case was assessed by the jury's best judgment rather than mathematical certainty. In *Cornia,* the plaintiffs brought suit against the defendant "for the loss of and damage to their cattle that grazed on defendant's property." *Id.* at 1381. At trial, the jury heard conflicting expert testimony regarding the value of the missing cows and, thus, the amount of damages that the plaintiffs may have suffered. *See id.* at 1387. The experts disagreed on a host of variables that would have affected the number of cattle available for sale and the price at which the cattle would have been sold, including, the cattle's "pregnancy rates, weight range, loss rates, and market prices," as well as "the calves' expected gender, weight range, mortality rates, and market prices." *Id.* The supreme court observed that because the "[p]laintiffs could not establish these elements as a matter of fact, ... the jury was free to use its best judgment in ascertaining and assessing the damages." *Id.* The supreme court concluded that "'the expert's estimates were a reliable enough basis for awarding damages[ but that] the assumptions used to arrive at those estimates are by no means the only way to arrive at [the] damages.'" *Id.* (second alteration in original) (quoting *Anesthesiologists Assocs. v. St. Benedict's Hosp.,* 852 P.2d 1030, 1042 (Utah Ct.App.1993), *rev'd on other grounds,* 884 P.2d 1236 (Utah 1994)). The supreme court ultimately upheld the denial of prejudgment interest because "[w]ithout any clear factual information, [the] plaintiffs' damages could not be measured by facts and figures or calculated with mathematical accuracy." *Id.* (internal quotation marks omitted).

¶ 57 Similarly, the damages in this case were based on lost profits on a product whose value was influenced by numerous variables. The jury clearly had evidence of the condominium units' value at the time they were actually sold, as well as the cost to build and market such a product. However, 3rd East sought lost profits for the product not as it was built but as it should have been built and as it should have been sold at an earlier date. The experts disagreed as to the profit that The Club would have received for the units if they had been built as originally planned prior to Watts's design changes. In short, the evidence presented to the jury did not contain clear factual information as to the exact figures that should be assigned to each variable affecting the value of the units as they should have been built.

¶ 58 Recently, in *Encon Utah, LLC v. Fluor Ames Kraemer, LLC,* 2009 UT 7, 622 Utah Adv. Rep. 23, 210 P.3d 263, the supreme court clarified that "[a] dispute, even between experts, as to the precise amount of damages does not necessarily preclude those damages from being measurable or calculable." *Id.* ¶ 64. The supreme court explicitly noted, however, that the damages sought by the plaintiff in that case were based on more certain and agreed upon figures than the damages sought by the plaintiffs in *Cornia. See id.* ¶¶ 64–65. The plaintiff in *Encon* sought to recover lost profits on a fixed-rate contract that had been half-completed, and both parties' experts agreed that a ten-percent profit margin was appropriate. *See id.* ¶ 60. The supreme court explained that the fact-finder in *Encon* only had to "exercis[e] its discretion to determine which expert's valuation was more accurate," which did not "present the same concern ... raised in *Cornia,* where the fact finder, '[w]ithout any clear factual information,' was left solely to its discretion to determine damages." *Id.* ¶ 65 (second alteration in original).

¶ 59 Although the experts' estimates in this case were "a reliable enough basis for awarding damages," the jury was left to use its discretion to determine the amount of damages. Given that the jury determined the amount of damages based on its best judgment rather than a figure ascertained with mathematical certainty, the trial court erred in awarding prejudgment interest.

B. Amount of Attorney Fees

¶ 60 Watts contends that 3rd East's failure to categorize its attorney fees

according to successful and unsuccessful claims created a deficient basis for the amount of attorney fees awarded and that the trial court's award therefore constituted error. "An award of attorney fees must be based on the evidence and supported by findings of fact." *Cottonwood Mall Co. v. Sine*, 830 P.2d 266, 268 (Utah 1992). "When the evidence presented is insufficient, an award of attorney fees cannot stand." *Foote v. Clark*, 962 P.2d 52, 55 (Utah 1998). From this arises the general rule that

> [o]ne who seeks an award of attorney fees must set out the time and fees expended for (1) successful claims for which there may be an entitlement to attorney fees, (2) unsuccessful claims for which there would have been an entitlement to attorney fees had the claims been successful, and (3) claims for which there is no entitlement to attorney fees.

*Cottonwood Mall*, 830 P.2d at 269–70. However, where a trial court finds that "almost all, if not all, of the legal services performed with respect to [an unsuccessful] claim were also relevant and necessary with respect to the other issues in the case upon which [the party] was successful," the party's lack of categorization will not undermine the sufficiency of the evidence supporting the award of attorney fees and the award is not in error. *Burton Lumber & Hardware Co. v. Graham*, 2008 UT App 207, ¶ 31, 186 P.3d 1012.

¶ 61 In this case, the trial court found that 3rd East's unsuccessful claims overlapped significantly with 3rd East's successful claim that Watts mismanaged the limited liability company to his benefit and at 3rd East's expense by failing or refusing to disclose relevant information to 3rd East regarding the costs of completing the project.[3] Accordingly, we see no error in the amount of attorney fees awarded.

## C. Costs

¶ 62 As a final issue, Watts claims that the trial court erred in awarding costs and litigation expenses as consequential damages.

Rule 54(d) of the Utah Rules of Civil Procedure states that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." Utah R. Civ. P. 54(d)(1). Utah courts have consistently made "a distinction between 'legitimate and taxable "costs" and other "expenses" of litigation which may be ever so necessary, but are not taxable as costs.'" *Morgan v. Morgan*, 795 P.2d 684, 687 (Utah Ct.App.1990) (quoting *Frampton v. Wilson*, 605 P.2d 771, 774 (Utah 1980)).

¶ 63 Costs are defined as "those fees which are required to be paid to the court and to witnesses, and for which the statutes authorize to be included in the judgment." *Frampton*, 605 P.2d at 774. "Thus, witness fees, travel expenses, and service of process expenses are chargeable" as costs but "only in accordance with the fee schedule set by statute." *Morgan*, 795 P.2d at 686–87. In light of this definition, recovery for the following litigation expenses is not allowed: (1) land surveys, accounting fees, and appraisal fees, *see id.* at 687; (2) trial exhibits, *see Young v. State*, 2000 UT 91, ¶ 22, 16 P.3d 549; (3) contour models, photographs, and certified copies of documents, *see Frampton*, 605 P.2d at 774; (4) photocopying costs, *see Chase v. Scott*, 2001 UT App 404, ¶¶ 19–20, 38 P.3d 1001 (acknowledging that photocopying costs "would not be included under a regular [r]ule 54(d) cost award" but allowing the prevailing party to recover them because the parties' contract provided for such recovery); and (5) "[a]ny amount paid over [a] statutory allowance" for witnesses, travel, or service of process fees, *see Young*, 2000 UT 91, ¶ 18, 16 P.3d 549.

¶ 64 This prohibition on awarding costs over statutory allowances applies even to expert witness fees. "[A] court cannot ordinarily award extra compensation to expert witnesses unless there is an express statutory provision." *John Call Eng'g v. Manti City Corp.*, 795 P.2d 678, 683 (Utah Ct.App.1990). In the absence of an express statutory provision, "[a]ny amount paid over

---

3. The trial court did, notably, reduce the amount of fees awarded for certain unsuccessful portions of 3rd East's litigation, such as mediation efforts, settlement discussions, lis pendens claims, and certain pretrial motions.

the statutory allowance is an expense of litigation, rather than a taxable cost, and not recoverable." *Young*, 2000 UT 91, ¶ 18, 16 P.3d 549.

¶ 65 On the other hand, "a party may recover deposition costs as long as the trial court is persuaded that [the depositions] were taken in good faith and, in light of the circumstances, appeared to be essential for the development and presentation of the case." *Id.* ¶ 6 (alteration in original) (internal quotation marks omitted). This does not necessarily require that the depositions be used at trial, "provided that other criteria are met." *Id.* ¶ 7. Other criteria could include the fact that "the development of the case was of such a complex nature that the information provided by the deposition could not have been obtained through less expensive means of discovery." *Id.*

¶ 66 Costs and litigation expenses are awardable as consequential damages only in limited circumstances. "Where a breach of contract has not occurred, the supreme court has allowed consequential damages only when the natural consequence of one's negligence is another's involvement in a dispute with a third party, which is also known as the third-party tort rule." *Lewiston State Bank v. Greenline Equip., LLC*, 2006 UT App 446, ¶ 22, 147 P.3d 951 (internal quotation marks omitted). Otherwise, "the damages in a tort action do not ordinarily include compensation for attorney fees or other expenses of litigation," absent a statute or contract that provides for such. Restatement (Second) of Torts § 914(1) & cmt. a (1979).

¶ 67 We conclude that the trial court did not abuse its discretion in awarding costs for 3rd East's filing fee, service of process fees, statutory witness fees, and deposition costs. As the prevailing party, 3rd East was entitled to recover the fees necessarily paid to witnesses and the court. The deposition costs were also properly awarded given that the three depositions—of Stevensen, Watts, and The Club's attorney—were essential to the prosecution of the action. Additionally, the information gained from them likely could not have been obtained through less expensive means of discovery in this complex case.

¶ 68 Nevertheless, the trial court erred in awarding 3rd East litigation expenses such as expert witness fees and photocopying expenses. 3rd East does not identify any statutory provision that would allow it to recover its expert witness fees above the statutory witness fee. Furthermore, photocopying costs are clearly the type of litigation expense that, while necessary, does not qualify as a taxable cost. The costs awarded by the trial court must be adjusted accordingly.

V. Attorney Fees on Appeal

¶ 69 3rd East claims attorney fees on appeal based on Watts's filing of a frivolous appeal. *See generally* Utah R.App. P. 24(a)(9) (requiring parties to specify the basis for their claim of attorney fees on appeal); *id.* R. 33(a) (providing that the prevailing party may recover attorney fees, among other damages, if the appeal taken is frivolous). Because we determine that Watts's appeal was not frivolous, we deny 3rd East's request for attorney fees incurred on appeal.

CONCLUSION

¶ 70 We conclude that the trial court correctly instructed the jury on the standard of care for a limited liability company manager in light of the fact that the limited liability company in this case had a sole purpose of developing real estate by building condominiums. Although the trial court erroneously omitted language in the damages instruction that would limit damages to lost net profits, the error did not affect the jury verdict. The trial court did not abuse its discretion in admitting the challenged expert testimony. Although there was sufficient evidence to support the verdict and the award of attorney fees, the trial court erroneously awarded prejudgment interest and litigation expenses beyond taxable costs.

¶ 71 Accordingly, we affirm in part, and we reverse and remand for a modification of the judgment as specified herein.

¶ 72 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and CAROLYN B. McHUGH, Judge.