2010 UT App 137

**Scott WILSON and Tiffany Wilson, Plaintiffs and Appellees,**

v.

**Angela JOHNSON, Defendant and Appellant.**

No. 20090193–CA.

Court of Appeals of Utah.

May 20, 2010.

Fifth District, St. George Department, 070500581; The Honorable James L. Shumate.

Sean A. Monson and Andrew V. Collins, Salt Lake City, for Appellant.

Michael F. Leavitt and Melinda L. Hill, St. George, for Appellees.

Before Judges McHUGH, ORME, and VOROS.

## OPINION

McHUGH, Associate Presiding Judge:

¶1 Angela Johnson challenges the trial court's grant of summary judgment in favor of Scott and Tiffany Wilson. Johnson contends that summary judgment was inappropriate because the seller financing addendum (SFA-1) to the Real Estate Purchase Contract (the REPC) was not binding upon her. Johnson alternatively argues that even if SFA-1 is enforceable, she was excused from performance because the Wilsons materially breached the contract by failing to tender $160,000 in cash and by failing to execute and deliver a promissory note and trust deed consistent with the requirements of SFA-1.

¶2 The Wilsons counter that summary judgment was proper. They assert that SFA-1 was enforceable because it was incorporated by reference into the final signed version of the REPC. They further claim that they fully performed their obligations under the contract by tendering 10% of the total purchase price at closing. We affirm the decision of the trial court holding that SFA-1 is binding on Johnson, but we reverse the award of summary judgment in favor of the Wilsons and the corresponding award of attorney fees.

## BACKGROUND

¶3 On January 6, 2007, the Wilsons made their initial offer to purchase Johnson's home in Washington, Utah (the Property) for $1,100,000. The REPC provided that the Wilsons would pay $110,000 down, comprised of $20,000 in earnest money and $90,000 in cash at closing, with the remaining $990,000 to be financed by the seller.[1] Those figures result in a 90 to 10 percent allocation between seller financing and the down payment, respectively. The initial offer included SFA-1, which outlined the interest rate and method of repayment, as an addendum and incorporated its terms by reference. Despite

the incorporation of SFA-1's terms into the offer, both the REPC and SFA-1 included a signature block for "Acceptance/Counteroffer/Rejection." The Wilsons faxed the offer with the attached SFA-1 to Johnson.

¶4 On January 8, 2007, Johnson executed the signature block on the REPC, rejecting the Wilsons' initial offer and making a counteroffer (Addendum 2), which raised the purchase price to $1,200,000.[2] *See generally Nunley v. Westates Casing Servs., Inc.*, 1999 UT 100, ¶27, 989 P.2d 1077 ("An acceptance must unconditionally assent to all material terms presented in the offer, including price and method of performance, or it is a rejection of the offer." (internal quotation marks omitted)). That same day, the Wilsons responded with a counteroffer (Addendum 3), modifying the purchase price to $1,150,000, with "[a]ll other terms and conditions to remain the same." Johnson accepted the Wilsons' counteroffer at 5:00 p.m. on January 8 by executing the signature block on Addendum 3 and by executing the signature block on the REPC. She did not execute the signature block on SFA-1. Subsequently, the Wilsons' agent inquired as to why Johnson had not also executed the signature block on SFA-1. Johnson responded that she wanted the payments broken out into principal and interest, taxes, and insurance.[3] On February 8, 2007, approximately one month after Johnson executed the REPC and Addendum 3, the Wilsons provided a second seller financing addendum (SFA-2), which provided for the same interest rate but allocated the monthly payments as requested. On February 10, 2007, the Wilsons delivered a check for the $20,000 earnest money required by the REPC, and Johnson negotiated the check. On the date set for closing, February 23, 2007, Johnson delivered a new seller financing addendum (SFA-3), which changed the seller financing terms and required acceptance by 5:00 p.m. that day. The Wilsons did not accept SFA-3. Instead, they tendered

---

1. SFA-1's terms were consistent with Johnson's advertisement that she was willing to seller-finance the sale of the Property.

2. In our discussion of the counteroffers, we note only the amended or additional terms that are relevant to this appeal.

3. The parties provided no evidence on the standards in the real estate industry concerning the execution of seller financing addenda, like those at issue here.

$115,000, an amount equal to 10% of the purchase price,[4] and executed a promissory note and trust deed for seller financing in the amount of $1,035,000, the remaining 90% of the purchase price. Johnson refused to sign the HUD–1 settlement statement, and the transaction did not close.

¶ 5 The Wilsons sued Johnson for breach of contract, and the parties brought cross-motions for partial summary judgment. Following argument on the motions, the trial court granted partial summary judgment in favor of the Wilsons. The court later granted the Wilsons' motion for summary judgment on damages, awarding them $40,000[5] in compensatory damages and over $33,000 in attorney fees and costs.

## ISSUE AND STANDARDS OF REVIEW

¶ 6 "The propriety of a grant ... of summary judgment is a question of law, which we review for correctness." *Glenn v. Reese*, 2009 UT 80, ¶ 6, 225 P.3d 185. Accordingly, we affirm a grant of summary judgment only "if there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). To make such a determination, we must consider "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Glenn*, 2009 UT 80, ¶ 6, 225 P.3d 185 (internal quotation marks omitted).

¶ 7 Whether summary judgment was appropriately granted in this case involves two distinct questions. The first is whether Johnson accepted the terms of SFA–1 when she accepted Addendum 3. The second is whether the Wilsons were entitled to judgment as a matter of law based on the terms of the contract as accepted by both parties. Paragraph 14 of the REPC contains the following integration clause: "This Contract together with its addenda, any attached exhibits, and Seller Disclosures, constitutes the entire Contract between the parties and supersedes and replaces any and all prior

negotiations, representations, warranties, understandings or contracts between the parties." Consequently, we must first look to the written contract "alone to determine its meaning and the intent of the contracting parties." *Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 44, 201 P.3d 966; *see also Tangren Family Trust v. Tangren*, 2008 UT 20, ¶ 17, 182 P.3d 326 (holding that "in the face of a clear integration clause, extrinsic evidence of a separate oral agreement is not admissible on the question of integration"). "Where the language is unambiguous, 'the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law.'" *Glenn*, 2009 UT 80, ¶ 10, 225 P.3d 185 (quoting *Café Rio, Inc. v. Larkin–Gifford–Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235). Only if the terms of the contract are ambiguous should the court consider extrinsic evidence of the parties' intent. *See Giusti*, 2009 UT 2, ¶ 44, 201 P.3d 966.

¶ 8 A contract is ambiguous "if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Glenn*, 2009 UT 80, ¶ 10, 225 P.3d 185 (internal quotation marks omitted). "[C]ontractual ambiguity can occur in two different contexts: (1) facial ambiguity with regard to the language of the contract and (2) ambiguity with regard to the intent of the contracting parties." *Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269. Facial ambiguity is a question of law, while the intent of the parties is a question of fact. *See id.* Before the court may consider extrinsic evidence of the parties' intent, however, it must first conclude that the contract is facially ambiguous. *See id.* Although the court may consider extrinsic evidence to determine whether the contract is facially ambiguous, that evidence may not be used to contradict the plain language of the contract. *See id.* ¶¶ 30–31. We now apply these rules of contract construction to the issues presented.

---

4. The Wilsons brought $95,000 in cash to closing, the balance remaining on 10% of the purchase price after the $20,000 nonrefundable earnest money previously delivered to Johnson.

5. Pursuant to the REPC, the Wilsons, as the buyers, were entitled to twice the amount of the $20,000 earnest money deposit as liquidated damages.

## ANALYSIS

### I. SFA–1 Is Enforceable Against Johnson.

¶ 9 Johnson first contends that SFA–1 is unenforceable because (1) she did not separately accept it as required by its express terms; (2) the Wilsons' subsequent conduct indicated that the parties had not reached an agreement regarding seller financing; and (3) enforcement of SFA–1 would violate the statute of frauds. The Wilsons counter that SFA–1 is enforceable, claiming that it was incorporated by reference into the REPC, which Johnson accepted as prescribed and in accordance with the statute of frauds.

### A. By Its Express Terms, SFA–1 Is Enforceable Despite Johnson's Failure to Accept It Separately.

¶ 10 In support of her position that SFA–1 is a separate agreement that required acceptance independent of the REPC, Johnson points to SFA–1's separate signature block and its express language that

[X] Seller [ ] Buyer shall have until 5:00 [ ] AM [X] PM Mountain Time on January 8, 2007 (Date) to accept the terms of [SFA–1] ... in accordance with Section 23 of the REPC. Unless so accepted, the offer as set forth in [SFA–1] ... shall lapse.

¶ 11 Johnson claims that because she did not execute the signature block on SFA–1 before the stated deadline, it was not binding on her. However, Addendum 3, the final counteroffer proposed by the Wilsons, was accepted by Johnson. Addendum 3 adjusted the purchase price, set the settlement date, and made the earnest money nonrefundable at a certain date, while stating that "[a]ll other terms and conditions [of the REPC] ... remain[ed] the same." The signature block on Addendum 3 reiterated, "To the extent the terms of this ADDENDUM modify or conflict with any provisions of the REPC, including all prior addenda and counteroffers, these terms shall control. All other terms of the REPC, including all *prior addenda* and counteroffers, *not modified by this ADDENDUM shall remain the same.*" (Emphases added.) Thus, upon Johnson's acceptance of Addendum 3, the original offer remained wholly intact, except as to the amount of the purchase price and the refundability of the earnest money deposit. Johnson accepted Addendum 3 at 5:00 p.m. on January 8, 2007, by checking the acceptance box, signing her name, and communicating her acceptance to the Wilsons. Johnson also executed the signature block on the REPC at that time.

¶ 12 To determine whether that acceptance also included the terms of SFA–1, we begin with the contractual language. *See Glenn v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185. The REPC contains three sections that identify SFA–1 as part of the initial offer. First, Section 9 incorporates SFA–1 by reference: "ADDITIONAL TERMS. There [X] ARE ... addenda to this [REPC] containing additional terms.... [T]he terms of the following addenda *are incorporated into this [REPC] by reference:* ... [X] [SFA–1]...." (Emphasis added.) Second, Section 2.1 also references the attached SFA–1 when it outlines the method of payment. Finally, Section 14 states, "COMPLETE CONTRACT. This [REPC] *together with its addenda,* any attached exhibits, and Seller Disclosures, constitutes the entire Contract between the parties...." (Emphasis added.) Likewise, SFA–1 expressly states that it "is made a part of th[e REPC]." Thus, pursuant to the plain and unambiguous language of both documents, SFA–1 was incorporated by reference and made a part of the REPC.

¶ 13 Having determined that SFA–1 was incorporated by reference into the REPC, we now address Johnson's contention that it could not be accepted in the absence of her completion of the Acceptance/Counteroffer/Rejection block contained at the bottom of SFA–1. "When an offer specifies the manner in which it must be accepted, it can only be accepted in the specified manner. Otherwise mutual assent is lacking, and no contract is formed." *Equitable Life & Cas. Ins. Co. v. Ross,* 849 P.2d 1187, 1192 (Utah Ct. App.1993); *see also* Restatement (Second) of Contracts § 30(1) (1981) ("An offer may invite or require acceptance to be made by ... performing a specified act ...."); *id.* § 30 cmt. a ("[T]he offeror is entitled to insist on a particular mode of manifestation of assent."). By its terms, SFA–1 is binding if it

is accepted (1) by 5:00 p.m. on January 8, 2007; and (2) in accordance with the provisions of Section 23 of the REPC. Johnson accepted Addendum 3 within the date and time restrictions specified in SFA–1. Thus, the only remaining issue is whether that acceptance was in accordance with the provisions of Section 23.

¶ 14 Section 23 of the REPC provides as follows:

> 23. ACCEPTANCE. "Acceptance" occurs when Seller or Buyer, responding to an offer or counteroffer of the other, (a) *signs the* offer or *counteroffer* where noted to indicate acceptance; and (b) communicates to the other party or to the other party's agent that the offer or counteroffer has been signed as required.

(Emphases added.) According to Johnson, because she neither signed SFA–1 nor communicated her separate acceptance of SFA–1 to the Wilsons, it was not enforceable.[6]

¶ 15 Although SFA–1 includes an Acceptance/Counteroffer/Rejection block, it requires that acceptance be in accordance with Section 23 of the REPC. That paragraph

provides only that the accepting party sign the *offer* or *counteroffer* and communicate such acceptance to the offering party.[7] In this instance, the original offer was rejected and counteroffers followed. Because SFA–1 was incorporated by reference into the REPC and was not modified by the subsequent counteroffers, acceptance of Addendum 3 included acceptance of SFA–1. By the terms of Addendum 3, Johnson agreed to the new purchase price, the nonrefundable earnest money, and all of the other terms of the initial offer, including SFA–1.[8] Thus, the trial court was correct in concluding, as a matter of law, that Johnson accepted the terms of SFA–1.[9]

B. Our Determination That SFA–1 Is Enforceable Does Not Create a Violation of the Statute of Frauds.

¶ 16 Utah's statute of frauds requires an agreement to transfer real property to be evidenced in writing. *See* Utah Code Ann. § 25–5–3 (2007) ("Every contract . . . for the sale, of any lands, . . . shall be void unless the contract . . . is in writing

6.  Johnson also did not indicate on SFA–1 her intention to "counteroffer" or "reject" the initial offer. Rather, she communicated her intent to counteroffer by executing the Acceptance/Counteroffer/Rejection block on the REPC only and limited her counterproposal to those changes indicated in Addendum 2.

7.  If the parties intended SFA–1 to be accepted only by execution of the Acceptance Block on SFA–1, they could have included language in Section 23 or SFA–1 to express that intention.

8.  Johnson and the dissent point to the Wilsons' submission of SFA–2 on February 8, 2007, as evidence that no agreement was reached regarding seller financing. However, the contract, including SFA–1, was formed a month earlier. Thus, the changes in SFA–2 may not be considered to contradict the plain language of the contract the parties had already entered, *see Daines v. Vincent*, 2008 UT 51, ¶¶ 30–31, 190 P.3d 1269.

    The dissent also contends that by making a counteroffer Johnson "expressed [her] dissatisfaction with" SFA–1, *see infra* ¶ 29. However, nothing in Johnson's counteroffer indicated that she objected to the terms of SFA–1. Rather, upon inquiry, Johnson merely requested that the payments be broken out into specific categories. The Wilsons' effort to allocate the payments due under SFA–1 among principal and interest, taxes, and insurance in SFA–2 was an accommoda-

tion to Johnson that did not change the material terms of the existing contract. *See generally Glenn v. Reese*, 2009 UT 80, ¶ 18, 225 P.3d 185 (holding that the submission of an addendum to a real estate purchase contract after it was accepted was an offer to modify the contract which became a nullity upon refusal). The first time Johnson indicated any objection to the material terms of SFA–1 was when she brought SFA–3 to closing.

Furthermore, the dissent's approach would be unwieldy. A counteroffer identifies the terms that are unacceptable in the offer so that the parties may focus on resolving those issues in future negotiations. The goal of the negotiation process is to identify an ever-shrinking list of disputed terms in the hope of reaching full agreement. The REPC's assumption that terms not identified in the counteroffer are acceptable facilitates that process.

9.  Notwithstanding our conclusion that, given the contract's unambiguous language, Johnson was bound by SFA–1, we recognize that some unnecessary confusion may have been created by the inclusion of a signature block on a document that, by its express terms, does not require that document to be signed. Similar problems could be prevented in future contracts by either eliminating the signature block or changing the language of the seller financing addendum to require that it be signed separately.

subscribed by the party by whom the ... sale is to be made...."). Johnson argues that SFA–1 must independently satisfy the statute of frauds because it modifies the REPC. *See generally Golden Key Realty, Inc. v. Mantas,* 699 P.2d 730, 732 (Utah 1985) ("[I]f an original agreement is within the statute of frauds, a subsequent agreement which modifies the original written agreement must also satisfy the requirements of the statute of frauds to be enforceable."). Because we have determined that SFA–1 is part of the REPC, the issue before us is whether the contract as a whole satisfied the statute of frauds. When a contract is expressed in multiple documents, even where some of the documents are unsigned, the statute of frauds is met when the signed writings expressly reference the unsigned writings. *See Gregerson v. Jensen,* 617 P.2d 369, 372–73 (Utah 1980) (holding that several writings may be construed together as containing all the terms of a contract for the sale of real property, notwithstanding the fact they are not all signed by the party to be charged); *Maytime Manor, Inc. v. Stokermatic, Inc.,* 597 P.2d 866, 868 (Utah 1979) (holding that an escalation clause contained in a proposal letter stapled to the front of a lease was incorporated into the lease and enforceable).

¶ 17 Particularly applicable to the present case is *Moody v. Smith,* 9 Utah 2d 139, 340 P.2d 83 (1959), where two parties signed a lease with an option to purchase real estate, *see id.* at 84. Attached to the signed lease was an "unsigned contract of sale," which the lease said contained all the terms of the purchase. *See id.* Affirming the trial court's determination that the seller was bound by the terms of the attached contract, the supreme court reasoned that

> the lease, which included the option, was signed and made reference to the contract merely as a document containing the terms of sale.... *These terms might as well have been noted on any document,* so long as it was identifiable and incorporated by reference into the signed document. *Such a*

> *paper would require no signature nor would the contract in this case.*

*Id.* (emphases added). Similarly here, the REPC—which governs the sale of the Property and has been executed by both Johnson and the Wilsons—expressly incorporates SFA–1 by reference. Thus, the requirements of the statute of frauds have been satisfied. *See* Utah Code Ann. § 25–5–3.

## II. Ambiguity Regarding the Payment Terms Requires Remand for Trial on the Issue of Intent.

¶ 18 Johnson alternatively claims that even if SFA–1 is enforceable, she is excused from performance because the Wilsons materially breached the contract by neglecting to tender $160,000 at closing and by failing to execute a trust deed and promissory note in the amount of $990,000.[10] *See generally Jackson v. Rich,* 28 Utah 2d 134, 499 P.2d 279, 280 (1972) ("[A] party first guilty of a ... material breach of contract cannot complain if the other party thereafter refuses to perform."). To support her claim, Johnson relies upon the fact that the REPC expressly provides for $990,000 in seller financing. The Wilsons argue in favor of the trial court's ruling, claiming that the parties intended for Johnson to seller-finance 90% of the purchase price, that the increase in purchase price changed the amount of seller financing proportionately, and that they tendered their 10% share at closing.

¶ 19 Both parties claim that the contract is unambiguous and must be read in support of their respective positions. We must first consider whether the contract is facially ambiguous, and if facial ambiguity is present, we next consider whether the agreement is also ambiguous as to the parties' intent. *See Daines v. Vincent,* 2008 UT 51, ¶ 25, 190 P.3d 1269. Because we conclude that the contract "is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies," we hold that it is facially ambiguous as to the terms of pay-

---

10. Under Johnson's theory, the Wilsons were obligated to pay $160,000, the difference between the purchase price and the agreed-upon seller financing, in cash at closing. She therefore asserts that by offering just $115,000 (the $20,000 down payment plus $90,000 cash at settlement), the Wilsons' down payment was $45,000 short.

ment. *See Glenn v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185 (internal quotation marks omitted).

¶ 20 The REPC and SFA–1 both expressly provide that Johnson will carry $990,000 in seller financing. Although other terms were changed, Addendum 3 does not adjust the amount of seller financing stated or indicate that any increase in the purchase price will result in a corresponding increase in that amount. Moreover, nothing in the REPC or Addendum 3 expressly supports the Wilsons' contention that the parties intended a 90 to 10 ratio of seller financing to cash. Rather, Addendum 3 modifies the purchase price but also provides for "[a]ll other terms and conditions to remain the same."

¶ 21 If none of the terms other than the purchase price are amended, however, the figures used to express the agreement mathematically do not result in an accurate equation. The REPC, in its initial form, provides as follows:

2. PURCHASE PRICE. The Purchase Price for the Property is $1,100,000.00.

2.1 Method of Payment. The Purchase Price will be paid as follows:

| | | |
|---|---|---|
| $ | 20,000.00 | (a) Earnest Money Deposit. Under certain conditions described in this [REPC], THIS DEPOSIT MAY BECOME TOTALLY NON-REFUNDABLE. |
| . . . . | | |
| $ | 990,000.00 | (d) Seller Financing (See attached Seller Financing Addendum if applicable) |
| . . . . | | |
| $ | 90,000.00 | (f) Balance of Purchase Price in Cash at Settlement |
| [=] | | |
| $1,100,000.00 | | PURCHASE PRICE. Total of lines (a) through (f) |

Thus, when the numbers used in the initial offer are tallied they equal the $1,100,000 purchase price. If, however, the purchase price is changed from $1,100,000 to $1,150,000, as provided in Addendum 3, but the other terms are left as in the initial offer, there is a discrepancy of $50,000 between the total financing and the purchase price. Therefore, the final version of the REPC is unclear on its face with respect to how the increase in purchase price was to be paid at closing. While the Wilsons argue that "it is

only sensible to assume" that the additional $50,000 was to be split between the seller financing and down payment based on the same 90 to 10 ratio used in the initial offer, Johnson contends that the amount of seller financing is limited to $990,000 because there is no mention of an agreement to a 90 to 10 ratio in SFA–1 or in any subsequent counteroffer. Under the final terms of this contract, both explanations are plausible. Thus, we conclude that the contract is facially ambiguous as to the terms of payment.

¶ 22 The trial court resolved this ambiguity by accepting the Wilsons' invitation to infer the intent to divide the additional $50,000 at a ratio of 90 to 10 between seller financing and down payment. We agree with Johnson that the resolution of this factual dispute about the parties' intent with respect to the increase in the purchase price could not be resolved by summary judgment. *See* Utah R. Civ. P. 56(c) (permitting summary judgment only where there are no disputes of material fact); *see also Daines*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (holding that ambiguity with regard to the intent of the contracting parties is a question of fact). Indeed, the trial court expressly stated that, absent a conclusion that the contract itself resolved the question of how to address the $50,000 gap, the trial court might "not be in a position to be able to do summary judgment at all" because the question of intent "may be a justiciable issue of fact that needs to be tried, or at least . . . needs to have some sort of discovery on it." Contrary to the conclusion of the trial court, we find no indication in the REPC that Johnson agreed to finance 90% of any purchase price that might be negotiated. Therefore, our determination that the contract was ambiguous with respect to the $50,000 gap requires us to remand the matter to the trial court for resolution of this factual dispute after trial.

¶ 23 If, after hearing evidence on intent, the trial court determines that the parties agreed to seller financing based on a 90 to 10 ratio, then it must enforce the contract according to the parties' intent. *See generally Coulter & Smith, Ltd. v. Russell*, 966 P.2d 852, 857 (Utah 1998) ("[A] cardinal rule in construing . . . a contract is to give effect to

the intentions of the parties." (alteration and omission in original) (internal quotation marks omitted)). Likewise, if Johnson prevails in convincing the finder of fact that the parties agreed that seller financing would be fixed at $990,000, the contract must be enforced consistent with that intent.

¶ 24 In contrast, the trier of fact may find that the parties never reached an agreement as to how the increase in the purchase price would be paid. The absence of an agreement on the terms of payment, as opposed to the amount to be paid, does not invalidate a contract. *See Reed v. Alvey*, 610 P.2d 1374, 1378–79 (Utah 1980) (enforcing a contract even though the terms of payment are "to be arranged" because where the price is settled, the form and manner of payment are incidental details). Rather, any uncertainty concerning the terms of payment is resolved in favor of full payment at closing. *See id.* (requiring cash payment at time of the tender of conveyance).

¶ 25 Here, the terms of payment were uncertain only as to the additional $50,000 of the purchase price negotiated through the counteroffers. In the absence of a contrary agreement, the full $50,000 was due from the buyers at closing, *see id.*, and the question of whether the Wilsons' failure to tender that amount in full at closing constituted a material breach of the contract is a question of fact to be determined by the trial court on remand,[11] *see Coalville City v. Lundgren*, 930 P.2d 1206, 1209 (Utah Ct.App.1997). Because there are material factual issues in dispute as to whether the parties reached a meeting of the minds concerning the terms for paying the $50,000 increase in purchase price, we are unable to resolve this matter in the first instance on appeal.

## CONCLUSION

¶ 26 We affirm the trial court's summary judgment in favor of the Wilsons on the issue of whether SFA–1 was accepted by Johnson, but we reverse the order of summary judgment in favor of the Wilsons on the question

of whether the Wilsons were entitled to liquidated damages and attorney fees. Because the contract as accepted is facially ambiguous as to the terms of payment and also ambiguous as to the parties' intent on that issue, we remand for trial. The Wilsons' request for attorney fees on appeal is denied. *See generally R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 27, 40 P.3d 1119 (awarding contractual attorney fees on appeal when the prevailing party in the trial court received attorney fees and that party also succeeded on appeal).

¶ 27 I CONCUR: J. FREDERIC VOROS JR., Judge.

ORME, Judge (dissenting):

¶ 28 I cannot agree that SFA 1 became part of the REPC or was otherwise agreed to. Not only was it unsigned, despite the fact that a signature line was provided as part of the form, but the Wilsons expected it to be signed and their agent inquired why it had not been. The reply was not that Johnson considered her signature unnecessary given the elaborate interplay of the various provisions outlined in the main opinion but, rather, that she found it unacceptable as written.

¶ 29 The Wilsons did not then take the position that, given the interplay of the provisions, Johnson was bound by SFA 1 whether she liked it or not, despite the lack of her signature on it, and notwithstanding her expressed dissatisfaction with it. Rather, the Wilsons prepared and submitted to her SFA 2, which they presumably hoped would meet her stated reservation about SFA 1. Johnson did not sign SFA 2 either, but instead submitted to the Wilsons yet a third version of the seller financing agreement, namely SFA 3. The Wilsons did not sign or otherwise accept SFA 3, instead tendering their performance in a manner that was not consistent with the terms of any of the three proposed versions of the seller financing agreement. Johnson, dissatisfied with the tender, refused to close.

---

11. The trial court expressly left open the question of whether the failure to tender payment in full at closing constituted a material breach, stating,

"[T]hat's the question. Is it breach? Is it material to the overall intention of the contract?"

¶ 30 Against this background, I do not see how it can be concluded that the parties had a meeting of the minds with respect to the terms of seller financing. The logic of the main opinion would work for me in a case where there was only a single version of a seller financing agreement; neither side expressed any reservation about it; neither side expressed any concern about the absence of an accepting signature on the form; and neither side submitted a different, subsequent version of the agreement. In such a case, a party who then latched onto the lack of a signature in a late effort to get out of the deal would have no sympathy from me, and I would have no trouble in holding that party's feet to the fire.

¶ 31 But the undisputed facts belie the apparent effect of these provisions in this case and require the opposite conclusion. If the parties viewed SFA 1 as an integral part of their deal given the terms of the REPC,

the Wilsons would not have inquired about the lack of Johnson's signature, Johnson would have had no explanation when she was asked, the Wilsons would not have proposed SFA 2, Johnson would not have proposed SFA 3, and the Wilsons' tendered performance would have matched up precisely with SFA 1.

¶ 32 Seller financing was a key element of this transaction. With no meeting of the minds on that important component of the deal, there was no deal. Each side was free to walk away. I would limit the proceedings on remand to shaping appropriate relief reflective of that reality.