2013 UT App 214

# THE UTAH COURT OF APPEALS

KIRK BLOSCH, MARTIN W. MERRILL, AND DAVID O'BAGY,
Plaintiffs and Appellants,
*v.*
NATIXIS REAL ESTATE CAPITAL, INC.,
Defendant and Appellee.

Opinion
No. 20110315-CA
Filed August 29, 2013

Third District, Salt Lake Department
The Honorable L.A. Dever
No. 070914778

Kathryn Collard, Attorney for Appellants
David K. Isom, Attorney for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES GREGORY K. ORME and STEPHEN L. ROTH
concurred.

CHRISTIANSEN, Judge:

¶1     Kirk Blosch, Martin W. Merrill, and David O'Bagy appeal
from a jury verdict finding that Blosch was not a third-party
beneficiary of a loan agreement between Natixis Real Estate
Capital, Inc. (Natixis), Schoolhouse Downtown, LLC, and
Schoolhouse Downtown's principal (Borrower).[1] Blosch also

---

[1]Blosch, Merrill, and O'Bagy are all parties to this appeal.
However, the only issues raised on appeal relate to Blosch's
purported rights as a third-party beneficiary of the agreement
between Natixis and Borrower. Thus, we refer primarily to

(continued...)

challenges the trial court's denial of his pretrial motion for summary judgment. We affirm.


BACKGROUND

¶2 On March 30, 2006, Natixis and Borrower entered into a loan agreement (the Loan Agreement) by which Natixis loaned Borrower $7.8 million.[2] The funds were to be used for the purchase and improvement of the Pierpont Building located in downtown Salt Lake City. As required by the Loan Agreement, approximately $1.2 million of the loaned funds was withheld in a reserve account (the Escrowed Funds). The Escrowed Funds were to be disbursed to Borrower once certain conditions outlined in the Loan Agreement were satisfied. These conditions included the completion, leasing, and operation of the Ruth's Chris Steak House restaurant space in the Pierpont Building.

¶3 In May 2006, Borrower attempted to draw from the Escrowed Funds, but Natixis's loan servicer denied Borrower's request because the contractual requirements for disbursement of the Escrowed Funds had not been met. Around that time, Borrower expressed frustration to Natixis over his inability to access the Escrowed Funds, but Natixis was unable or unwilling to release the funds prior to completion of the contractual conditions. After his

---

[1](...continued)
Blosch as the appellant throughout this opinion. Neither Borrower nor any entity owned or controlled by Borrower is a party to this action.

[2]Due to the voluminous record involving non-parties and transactions not relevant to the claims before this court, "[w]e limit our discussion to only those background facts necessary to resolve the issues on appeal." *See Holladay v. Storey*, 2013 UT App 158, ¶ 2 n.1.

request to access the Escrowed Funds was refused, Borrower solicited Blosch to borrow money in order to complete the restaurant space and free the Escrowed Funds for disbursement. Borrower represented to Blosch that the Escrowed Funds totaled $1.5 million and that Borrower would need the loan from Blosch for only ninety days.

¶4 Blosch agreed to arrange a loan of approximately $1 million to Borrower provided that Natixis would release the Escrowed Funds directly to an entity designated by Blosch once the contractual requirements for disbursement were met. Borrower arranged with a loan officer at Natixis (the Loan Officer) for the Escrowed Funds to be paid jointly to Blosch and Borrower, which required Natixis to "vet" Blosch as a legally permissible payee under federal law. On July 11, 2006, the Loan Officer emailed to Borrower a letter (the Joint Check Letter), which read, in relevant part,

> Dear [Borrower]:
>
> This letter confirms [Natixis's] completion of the vetting process for Kirk Blosch. Upon satisfaction of all requirements outlined in the Loan Documents, [Natixis] will release the escrow funds associated with the Ruth's Chris restaurant via a check issued to both you and Mr. Blosch.

¶5 On July 12, 2006, Borrower executed a promissory note to Blosch, O'Bagy, and Merrill promising to repay on or before October 12, 2006, the loan balance of $1,050,000, together with a loan fee of 15%, for a total repayment of $1,207,500. Any balance remaining unpaid after October 12, 2006, was subject to a 60% annual interest rate. Blosch, O'Bagy, and Merrill tendered to Borrower checks totaling $1,050,000.

¶6 In August 2006, Natixis sold Borrower's loan to LaSalle Bank, and Capmark Finance, Inc. (Capmark) became the new

servicer for the Loan Agreement. Natixis did not communicate to LaSalle Bank or Capmark that Natixis had agreed to the release of the Escrowed Funds via joint check to Borrower and Blosch, and did not provide LaSalle Bank or Capmark with a copy of the Joint Check Letter.

¶7     On September 12, 2006, Borrower notified Natixis that the restaurant was in operation and requested guidance on how to obtain the release of the Escrowed Funds. Natixis directed Borrower to contact Capmark to arrange for release of the Escrowed Funds. On October 10, Borrower instructed Capmark to release the Escrowed Funds via wire transfer to the account of Wasatch Prime, LLC, another entity owned by Borrower. Capmark released the Escrowed Funds in full to Wasatch Prime, LLC on October 18, 2006.

¶8     In November 2006, Blosch contacted Natixis to find out why he had not received a joint payment of the Escrowed Funds after the restaurant space was completed. Natixis informed Blosch that the Escrowed Funds had been wired directly to Borrower. Blosch then met with Borrower, who informed Blosch that the money had been used for other purposes and that he was unable to repay the promissory note.

¶9     On October 15, 2007, Blosch, Merrill, and O'Bagy filed a complaint against Natixis alleging breach of contract. Blosch moved for summary judgment, arguing that, as a matter of law, he was a third-party beneficiary of the Loan Agreement as amended by the Joint Check Letter. The trial court denied Blosch's motion, observing that the Loan Agreement unambiguously precludes third-party beneficiary claims, and stating, "Whether there was intent among all parties to modify the Loan, is an issue of fact and cannot be determined by this Court."

¶10     The case proceeded to trial in September 2010, and the jury returned a special verdict finding that Blosch was not a third-party beneficiary of the Loan Agreement. On December 14, 2010, the trial

court entered an order dismissing with prejudice all of Blosch, Merrill, and O'Bagy's claims against Natixis. Blosch timely filed a motion for a new trial, arguing that the jury's verdict was against both the weight of the evidence and the law, and that the trial court had erred in instructing the jury regarding the effect of Natixis's assignment of the Loan Agreement. However, Blosch's supporting memorandum was struck for failure to comply with the Utah Rules of Civil Procedure, and his motion was denied on March 7, 2011. Blosch filed his notice of appeal on April 4, 2011.

ISSUES AND STANDARDS OF REVIEW

¶11 As an initial matter, Natixis challenges whether this court has jurisdiction to hear this appeal. "'[T]he issue of subject matter jurisdiction is a threshold issue, which can be raised at any time and must be addressed before the merits of other claims.'" *Robinson v. Baggett*, 2011 UT App 250, ¶ 12, 263 P.3d 411 (alteration in original) (quoting *Houghton v. Dep't of Health*, 2005 UT 63, ¶ 16, 125 P.3d 860). "Whether this court has jurisdiction to hear an appeal is a question of law." *McClellan v. State*, 2012 UT App 316, ¶ 5, 290 P.3d 326 (citation and internal quotation marks omitted). Because we conclude that we have jurisdiction over this appeal, we address Blosch's substantive claims.

¶12 Blosch first argues that the trial court erred in denying his summary judgment motion. We review "a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness." *See Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citation and internal quotation marks omitted). The trial court's denial of summary judgment was based upon its interpretation of the Joint Check Letter and the Loan Agreement. "We accord a trial court's interpretation of a contract no deference and review it for correctness." *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 11, 210 P.3d 263.

¶13    Blosch also argues that insufficient evidence supported the jury's verdict that Blosch was not a third-party beneficiary of the Loan Agreement. "In reviewing a jury verdict, we view the evidence in the light most supportive of the verdict[] and assume that the jury believed those aspects of the evidence which sustain its findings and judgment." *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 467 (Utah 1996) (citation and internal quotation marks omitted). "Accordingly, we will upset a jury verdict only upon a showing that the evidence so clearly preponderates in favor of the appellant that reasonable people would not differ on the outcome of the case." *Id.* (citation and internal quotation marks omitted).

¶14    Finally, Blosch argues that the trial court erred in instructing the jury on the effect of Natixis's assignment of the Loan Agreement. We review challenges to jury instructions for correctness, "granting the trial court no deference on its view of the law." *Id.* at 466 (citation omitted).

ANALYSIS

I. This Court Has Jurisdiction To Hear the Appeal.

¶15    Natixis argues that this court does not have jurisdiction to hear the appeal because Blosch did not timely file a notice of appeal. Generally, a notice of appeal must be filed within thirty days after the date of entry of the judgment appealed from. Utah R. App. P. 4(a). However, "[i]f a party timely files in the trial court . . . a motion for a new trial under Rule 59," "the time for all parties to appeal from the judgment runs from the entry of the order disposing of the motion." *Id*. R. 4(b).

¶16    Natixis acknowledges that Blosch filed a notice of appeal within thirty days of the trial court's order denying his rule 59 motion. Natixis argues, however, that because the trial court struck the memorandum Blosch submitted in support of his rule 59 motion, the motion failed to comply with Utah Rule of Civil

Procedure 7(c)'s requirement that all motions be accompanied by a supporting memorandum. *See* Utah R. Civ. P. 7(c). Natixis argues that because the motion was unsupported by a memorandum, it was "a nullity" and therefore did not toll Blosch's deadline for a notice of appeal under rule 4(b).

¶17    We do not agree that Blosch's motion was a nullity or that his failure to file a compliant memorandum prevented the tolling of his time to appeal in this case. Tolling of the time to appeal under rule 4 is triggered when a party "timely files in the trial court" one of the motions enumerated under rule 4(b), such as a rule 59 motion for a new trial. *Id.* Failure to submit a supporting memorandum as required by rule 7 of the Utah Rules of Civil Procedure may render such a motion insufficient. *Menzies v. Galetka*, 2006 UT 81, ¶ 68, 150 P.3d 480. However, "[a] party can timely move the court for relief despite the fact that its motion may be insufficient." *Menzies*, 2006 UT 81, ¶¶ 68–69 (holding that a rule 60(b) motion that was unsupported by a memorandum for sixteen months after its filing was nevertheless timely filed). A trial court faced with an insufficient motion has the discretion to deny the motion or to allow the party who filed the motion to supplement it. *Id.* ¶ 68.

¶18    Here, Blosch timely moved the trial court for a new trial under rule 59. While the trial court struck Blosch's supporting memorandum for failure to comply with the requirements of the Utah Rules of Civil Procedure, that decision rendered Blosch's motion insufficient, not untimely or a nullity. Notably, Natixis moved the trial court to strike not just Blosch's memorandum but the rule 59 motion in its entirety. However, the trial court struck only Blosch's supporting memorandum and did not strike Blosch's motion. Instead, the trial court ruled on the motion and denied it. Blosch's time to appeal therefore ran "from the entry of the order disposing of" his rule 59 motion. *See* Utah R. App. P. 4(b).

¶19    Because we determine that Blosch's rule 59 motion satisfied rule 4(b)'s requirements and tolled his time to appeal, we conclude

that Blosch's notice of appeal was timely and that we have jurisdiction to consider the merits of his appeal.

    II. The Trial Court Correctly Denied Summary Judgment.

A.    This Court May Review the Trial Court's Denial of Summary Judgment.

¶20    Blosch first argues that the trial court erred in denying his summary judgment motion. "Generally, the denial of a motion for summary judgment is not reviewable on appeal because the movant has had the opportunity to fully litigate [at trial] the issues raised in the summary judgment motion[]." *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2013 UT 24, ¶ 12 (alterations in original) (citation and internal quotation marks omitted). However, "we do not require parties to reargue at trial legal issues that a trier of fact cannot decide." *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 14, 215 P.3d 152. Thus, when a legal ruling made on summary judgment is dispositive of a legal issue for trial, such that no factual issue at trial could affect the legal determination, we may review that legal ruling on appeal. *See id.* ¶¶ 12, 14 (observing that denials of summary judgment based on legal issues the parties were effectively foreclosed from litigating at trial are appealable).

¶21    In denying Blosch's motion for summary judgment, the trial court explained,

> The case law provides that a third-party may claim contract benefit only if the parties to the contract clearly express it. Loan Term ¶10.19 unambiguously precludes such third-party claims. However, the [Joint Check Letter] provides:
>
>> This letter confirms [Natixis's] completion of the vetting process for Kirk Blosch. Upon satisfaction of all the requirements outlined in the Loan Documents, [Natixis] will release the

> escrow funds associated with the Ruth's Chris restaurant via a check issued to both [Borrower] and Mr. Blosch.
>
> Whether there was intent among all parties to modify the Loan, is an issue of fact and cannot be determined by this Court.

(Citations omitted.) Blosch contends that the trial court denied his motion for summary judgment based solely on the trial court's legal conclusion that it was a question of fact for the jury whether Natixis and Borrower intended to modify the Loan Agreement to make Blosch a third-party beneficiary. Blosch argues that because the trial court never found that the Joint Check Letter was ambiguous as to the parties' intent to make Blosch a third-party beneficiary, the trial court erroneously concluded that intent was a question of fact, rather than a question of law.

¶22   We agree that the trial court's denial of Blosch's motion for summary judgment was based on a purely legal issue. However, we disagree that the trial court never determined that the Joint Check Letter was ambiguous. It is well established that "[b]efore the [trial] court may consider extrinsic evidence of the parties' intent . . . it must first conclude that the contract is facially ambiguous." *Wilson v. Johnson*, 2010 UT App 137, ¶ 8, 234 P.3d 1156 (citing *Daines v. Vincent*, 2008 UT 51, ¶ 51, 190 P.3d 1269). If the trial court determines that the language of an agreement is facially ambiguous as a matter of law, "the intent of the parties is a question of fact." *Id.* In light of this rule, we interpret the trial court's ruling as implicitly finding the Joint Check Letter ambiguous as a matter of law as to whether the parties intended that agreement to modify the Loan Agreement so as to make Blosch a third-party beneficiary. *See West Valley City v. Walljasper*, 2012 UT App 252, ¶ 27, 286 P.3d 948. ("Unless the record indicates otherwise, we presume that the trial court knew the law."). As a result of its ruling, the trial court denied summary judgment

because the disputed material facts concerning the intent of the Joint Check Letter could only be determined by the jury, and Blosch was therefore not entitled to judgment as a matter of law. Thus, the denial of Blosch's motion for summary judgment was based on the trial court's legal determination that the Joint Check Letter is facially ambiguous as to the parties intent, and we may review this ruling on appeal.

¶23    Our determination that we may review the trial court's ruling in this case is consistent with our supreme court's reasoning in *Normandeau*, 2009 UT 44, which explained that appellate courts may review a summary judgment ruling based on facts and legal theories the moving party was foreclosed from arguing at trial. *Id.* ¶ 7. Because "[p]urely legal issues are not decided by a trier of fact," parties may be effectively foreclosed from raising legal issues at trial that were decided by the trial court at the summary judgment stage. *Id.* ¶ 14. In *Normandeau*, our supreme court cited with approval cases reviewing pretrial denials of summary judgment motions in which the trial court had made purely legal rulings regarding, for example, accord and satisfaction, *id.* ¶ 12 (citing *Estate Landscape & Snow Removal Specialists, Inc. v. Mountain States Tel. & Tel. Co.*, 844 P.2d 322, 325–26 (Utah 1992)), and the existence of a contract as a matter of law, *id.* ¶ 13 (citing *Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, ¶ 13, 94 P.3d 179). The supreme court observed that it would have been futile for the parties to litigate these issues at trial because "both the existence of an accord and satisfaction and the existence of a contract in these cases were legal issues decided by the court." *Id.* ¶ 14.

¶24    Here, the trial court's determination that the Joint Check Letter is facially ambiguous as a matter of law was dispositive of the issue of ambiguity. It would have been futile for Blosch to attempt to litigate whether the Joint Check Letter was facially ambiguous at trial because the jury could not decide this purely legal issue. *See id.* ¶ 12. In other words, while the trial court denied Blosch's motion for summary judgment because its legal ruling on facial ambiguity meant there were disputed issues of material fact

as to the parties' intent, Blosch was effectively foreclosed by that ruling from litigating the issue of ambiguity at trial. We may therefore review the trial court's legal ruling that was the reason for its denial of Blosch's summary judgment motion. *See id.* ¶ 14.

B.    The Trial Court Did Not Err in Denying Blosch's Motion for Summary Judgment, Because the Joint Check Letter Is Facially Ambiguous as to the Parties' Intent To Make Blosch a Third-Party Beneficiary of the Loan Agreement.

¶25    As explained above, because Blosch's appeal from the denial of his summary judgment motion comes after trial, our review of that denial is limited solely to the legal issue on which the trial court ruled in denying Blosch's motion, i.e., whether the Joint Check Letter was, as a matter of law, facially ambiguous with respect to the parties' intent.[3] "A contractual term or provision is ambiguous if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Strohm v. ClearOne Communications, Inc.*, 2013 UT 21, ¶ 34 (citation and internal quotation marks omitted). "[F]acial ambiguity with regard to the language of the contract . . . is a question of law, while the intent of the parties is a question of fact." *Wilson*, 2010 UT App 137, ¶ 8.

¶26    With respect to Blosch's status as a third-party beneficiary of the Loan Agreement, "[a] third party may claim a contract benefit only if the parties to the contract clearly express an intention to confer a separate and distinct benefit on the third party." *Bybee v. Abdulla*, 2008 UT 35, ¶ 36, 189 P.3d 40 (citation and internal quotation marks omitted). For the Joint Check Letter to unambiguously show that the parties intended to make Blosch a

---

[3]We note that Blosch frames these issues somewhat differently in his arguments to this court. However, our conclusion that the Joint Check Letter is facially ambiguous is dispositive of the challenges Blosch raises to the trial court's denial of his summary judgment motion.

third-party beneficiary of the Loan Agreement, "[t]he contract must be undertaken for the plaintiff's direct benefit and the *contract itself* must affirmatively make this intention clear." *See SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 50, 28 P.3d 669 (emphasis added).

¶27    The operative language of the Joint Check Letter provides, "Upon satisfaction of all requirements outlined in the Loan Documents, [Natixis] will release the escrow funds associated with the Ruth's Chris restaurant via a check issued to both [Borrower] and Mr. Blosch." Blosch argues that this language unambiguously demonstrates Natixis's and Borrower's intent to make Blosch a third-party beneficiary of the Loan Agreement. However, we see nothing in the language of the Joint Check Letter from which Natixis and Borrower's intent in entering into the agreement can be ascertained. Whether or not Natixis and Borrower intended the Joint Check Letter for Blosch's "direct benefit," the language of the Joint Check Letter itself does not "affirmatively make this intention clear." *See id.* ¶ 50. This "facial deficiency" is highlighted when compared with joint payment agreements held to unambiguously create a third-party beneficiary status.

¶28    In *Gender Machine Works, Inc. v. Eidal International Sales Corp.*, 929 P.2d 1033 (Or. Ct. App. 1996), plaintiff Gender Machine Works (Gender) was subcontracted by Eidal International Sales Corporation (Eidal) to manufacture a shredder for sale to defendant Archer Daniels Midland Company (ADM). *Id.* at 1036. In order to satisfy a preexisting debt to Gender, and to compensate Gender for manufacturing the shredder, Eidal arranged with ADM for payment on the shredder to be made payable to both Eidal and Gender. *Id.* at 1036 & n.2. The operative terms of the agreement at issue there read,

> Eidal's joint venture manufacturing partner, Gender Machine is processing a substantial amount of work on this project (Purchase Order B89109200083RP) and this letter is sent to your group informing you

that they are authorized by Eidal to submit an
invoice with Eidal allowing them to collect the sum
of $225,000.00 for work performed by their group on
this project.

Eidal and Gender will invoice jointly with one
invoice with payment to be made by ADM in both
Gender's and Eidal's names.

Due to our financing needs, we are requesting this
acknowledgment by your group today so that we can
get started on this expedited project. We would like
to start today.

*Id.* at 1036 (internal quotation marks omitted). ADM signed the
agreement and confirmed its understanding that payment should
be made to both Eidal and Gender. *Id.* After the shredder was
delivered, Eidal invoiced ADM without reference to Gender, and
ADM paid the full amount in a check made payable to Eidal only.
*Id.* Gender brought a third-party beneficiary breach of contract
claim against ADM. *Id.* at 1037. The Oregon Court of Appeals
determined that the parties' intent to benefit Gender by the
agreement was unambiguous from the language of the agreement
because it stated both that Gender was performing substantial
work on the shredder which ADM had purchased and that
payment was therefore to be paid jointly to Eidal and Gender. *Id.*
at 1039.

¶29    In contrast, in *Eastern Aviation Group, Inc. v. Airborne Express,
Inc.*, 8 Cal. Rptr. 2d 355 (Cal. Ct. App. 1992), plaintiff Eastern
Aviation Group (EAG) was an investor in Burbank Aeronautical
Corporation (BAC) and was entitled by contract between EAG and
BAC to 50% of the profits generated by BAC's sales of aircraft noise
reduction systems. *Id.* at 356. BAC entered into a contract to sell
such systems to ABX Air, Inc. (ABX), with a provision stating, "'All
payments hereunder shall be in good U.S. funds and shall not be
credited to the account of the Purchaser until such funds are

cleared in the Designated Account, which shall be designated in writing jointly by BAC and [EAG] . . . .'" *Id.* at 357 (omission in original). ABX allegedly made payments directly to BAC, rather than into the jointly designated account, and EAG attempted to sue ABX for violating the sales contract between BAC and ABX on the theory that EAG was made a third-party beneficiary by the joint payment provision. *Id.* The California Court of Appeal observed,

> The fact that he is incidentally named in the contract, or that the contract, if carried out according to its terms, would inure to his benefit, is not sufficient to entitle him to demand its fulfillment. It must appear to have been the intention of *the parties* to secure to him personally the benefit of its provisions.

*Id.* (citation and internal quotation marks omitted). The court held that ABX's obligation was only to BAC—the provision directing payments to the joint account was merely to accommodate BAC, not BAC's creditors—and EAG was therefore not a third-party beneficiary of the sales contract. *Id.* at 358.

¶30    We conclude that the Joint Check Letter is ambiguous as to whether the intent of the parties in entering into the agreement was to directly benefit Blosch as a third-party beneficiary. The operative language of the Joint Check Letter contains no expression of intent to benefit Blosch, and instead merely directs that "[u]pon satisfaction of all requirements outlined in the Loan Documents, [Natixis] will release the escrow funds associated with the Ruth's Chris restaurant via a check issued to both [Borrower] and Mr. Blosch." By comparison, the language of the joint payment agreement in *Gender* demonstrated the parties' intent to enter into the agreement to "allow[ Gender] to collect the sum of $225,000.00 for work performed by their group on this project," due to the "substantial amount of work" performed by Gender, and the "financing needs" of Eidal. 929 P.2d at 1036. Absent a similarly specific and clear expression of the parties' intent to benefit a third party by entering into the agreement, we cannot read the plain

language of the Joint Check Letter, which merely directs the manner in which payment under a contract shall be made, as clearly expressing an intent by the parties to assume an enforceable obligation to the third-party joint payee. *See Eastern Aviation*, 8 Cal. Rptr. 2d at 358; *Bybee*, 2008 UT 35, ¶ 36. While there may be other evidence extrinsic to the Joint Check Letter from which the parties' intent could be determined, that is a factual question and is inappropriate for decision on summary judgment. Thus, the trial court properly concluded that the Joint Check Letter was ambiguous as a matter of law, and the trial court's denial of summary judgment was therefore correct.

### III. Sufficient Evidence Supported the Jury's Verdict.

¶31    Blosch next claims that the evidence presented at trial was legally insufficient for the jury to determine that Blosch was not a third-party beneficiary. A party challenging the sufficiency of the evidence "has the heavy burden of marshaling the evidence in support of the verdict and showing that the evidence, viewed in the light most favorable to the verdict, is insufficient." *State v. Maese*, 2010 UT App 106, ¶ 16, 236 P.3d 155 (citation and internal quotation marks omitted). "The existence of conflicting evidence, alone, does not justify overturning a verdict for insufficient evidence because 'we assume that the jury believed those facts that support its verdict.'" *Stevensen 3rd East, LC v. Watts*, 2009 UT App 137, ¶ 49, 210 P.3d 977 (quoting *Canyon Country Store v. Bracey*, 781 P.2d 414, 417 (Utah 1989)).

¶32    Blosch primarily attacks the sufficiency of the Loan Officer's testimony at trial regarding the Loan Officer's knowledge and intent—and therefore Natixis's knowledge and intent—in drafting the Joint Check Letter. Blosch argues that this evidence of Natixis's intent is legally insufficient for the jury to find that Blosch was not a third-party beneficiary of the Loan Agreement because the language of the Joint Check Letter unambiguously establishes Natixis and Borrower's intent to make Blosch a third-party beneficiary, and Natixis and Borrower had the right to modify the

provision of the Loan Agreement prohibiting third-party beneficiaries. We have determined that the Joint Check Letter did not unambiguously establish Natixis and Borrower's intent to make Blosch a third-party beneficiary of the Loan Agreement. Therefore, because the Joint Check Letter is ambiguous as to the parties' intent, evidence that Natixis did not intend to make Blosch a third-party beneficiary of the Loan Agreement, if believed by the jury, would be sufficient to support the jury's verdict.

¶33    Here, the Loan Officer's testimony that he believed the Loan Agreement prohibited third-party beneficiaries, that he did not intend to modify the Loan Agreement by entering into the Joint Check Letter, that he drafted the Joint Check Letter to accommodate Borrower, and that he did not know that Borrower had asked for the Joint Check Letter to be drafted in order to facilitate a loan from Blosch, all tend to demonstrate that Natixis did not intend to make Blosch a third-party beneficiary of the Loan Agreement. Additionally, the Loan Officer's testimony that he believed Borrower could revoke the Joint Check Letter or otherwise direct the disbursement of funds notwithstanding the Joint Check Letter, can be understood to show that Natixis did not believe or intend the Joint Check Letter to create in Blosch an enforceable right to receive payment of the Escrowed Funds from Natixis once the terms of the Loan Agreement were satisfied. Based on this evidence regarding Natixis's intent, we do not believe that the evidence so clearly preponderates against the jury's verdict that

reasonable people could not differ on the outcome of the case.[4] *See Watts*, 2009 UT App 137, ¶ 26.

¶34    Because we conclude that there was sufficient evidence for the jury to find that Natixis did not intend to make Blosch a third-party beneficiary of the Loan Agreement, we affirm the jury's verdict that Blosch was not a third-party beneficiary of the Loan Agreement.

IV. Any Error in the Jury Instruction Was Harmless.

¶35    Finally, Blosch argues that the trial court erred in instructing the jury on the effect of Natixis's assignment of the Loan Agreement. "To prevail on an appeal based on instructions to the jury, this court must find both that the instruction was inaccurate and that there is not a mere possibility, but a reasonable likelihood that the error affected the result." *Stevensen 3rd East, LC v. Watts*, 2009 UT App 137, ¶ 28, 210 P.3d 977 (citation and internal quotation marks omitted). Thus, even if the jury instruction was legally incorrect, we will reverse "only if [our] confidence in the jury's verdict is undermined." *Wilson v. IHC Hosps., Inc.*, 2012 UT 43, ¶ 24, 289 P.3d 369 (alteration in original) (citation and internal quotation marks omitted).

¶36    The challenged jury instruction (Instruction 15) reads, "Whether an assignment of a contract includes an assumption of

---

[4]Blosch also argues that the Loan Officer's testimony that Natixis sold the Loan Agreement to another lender cannot support the jury's verdict that Blosch was not a third-party beneficiary of the Loan Agreement. However, the jury never reached the issue of whether Natixis's assignment of the Loan Agreement to another lender was a defense to Blosch's claims, and the jury did not need to consider the Loan Officer's testimony on this point to determine that Blosch was not a third-party beneficiary of the Loan Agreement.

liabilities depends on the terms of the assignment and the parties' intent." Blosch argues that Instruction 15 fails to instruct the jury that "an assignment does not relieve the assignor of duties and obligations unless otherwise stated" and that such an instruction is compelled by *Winegar v. Froerer Corp.*, 813 P.2d 104 (Utah 1991). *See id.* at 107–08 (explaining the legal distinction between assignment of rights and delegation of obligations under a contract). However, assuming without deciding that the jury instruction was erroneous, Blosch must demonstrate a "reasonable likelihood that the error affected the result" to justify reversal. *Watts*, 2009 UT App 137, ¶ 28.

¶37    Blosch recognizes that because the jury determined that he was not a third-party beneficiary of the Loan Agreement, it never reached the issue of whether Natixis's assignment of the Loan Agreement to another lender was a defense to Blosch's claims. Because the jury did not reach this issue, any error in Instruction 15 could not have affected the result with respect to the effect of the assignment. Blosch instead argues that he was prejudiced by errors in Instruction 15 because Natixis used the instruction in its closing argument "to mislead the jury to believe that, as a result of Natixis's purported sale and assignment of [the Loan Agreement], Natixis ceased to have any obligation to Blosch under the Joint Check Letter, such that Blosch was not a third party beneficiary of any agreement between Natixis and [Borrower]."

¶38    We do not agree that Natixis used Instruction 15 to mislead the jury. In its closing argument, Natixis argued that even if the jury found that Blosch had established the elements of his claim, the assignment of the Loan Agreement would nevertheless serve as a defense for Natixis against Blosch's claims. In its only specific reference to Instruction 15, Natixis argued only that the Loan Agreement "made it absolutely clear" that assignment of obligations was contemplated and that the assignee therefore had all the responsibilities and rights under the Loan Agreement. Nothing in these statements was misleading as to whether Blosch

was a third-party beneficiary of the Loan Agreement, and Natixis did not argue that the jury could find that Blosch was not a third-party beneficiary as a result of the assignment of the Loan Agreement. Under these circumstances, there is no reasonable likelihood that Natixis's argument, to the extent it was based on the allegedly erroneous jury instruction, affected the jury's verdict that Blosch was not a third-party beneficiary of an agreement.[5] *See id*. Because our confidence in the verdict is not undermined, we decline to reverse on this basis.

CONCLUSION

¶39    We have jurisdiction to hear this appeal because Blosch timely filed a rule 59 motion with the trial court, effectively tolling his time to appeal. Our review of the denial of Blosch's summary judgment motion is limited to the legal ruling that the Joint Check Letter was ambiguous, and we determine that the trial court did not err in so ruling. Blosch has not demonstrated that the evidence was insufficient to sustain the jury's verdict that he was not a third-party beneficiary of the Loan Agreement. Nor has he demonstrated that there is a reasonable likelihood that any claimed error in the jury instructions affected the jury's verdict.

¶40    Affirmed.

———————

[5]Blosch also argues that the trial court erred by refusing to instruct the jury that "[t]he fact Natixis sold [Borrower's] loan obligation to a third party is not a defense to any of Plaintiff's claims." However, for the same reasons explained previously, *see supra* ¶¶ 37–38, there is no likelihood that this refusal, even if erroneous, affected the jury's verdict.